## STATE v. ROY LEE TODD.

(Filed 2 June, 1965.)

**1. Homicide § 13—**

Where defendant makes no judicial admission that he intentionally shot deceased, but the State introduces evidence of an intentional killing with a deadly weapon, it is for the jury to determine whether they are satisfied from the evidence beyond a reasonable doubt that the killing with a deadly weapon was intentional, in which event the law will presume that the killing was unlawful and that it was done with malice, constituting murder in the second degree.

**2. Same—**

Where an intentional killing with a deadly weapon is admitted or proved by the State's evidence, the defendant has the burden of showing to the satisfaction of the jury legal provocation negating malice and thus reducing the offense to manslaughter, or of establishing self-defense exculpating defendant altogether, legal provocation and self-defense being affirmative pleas.

**3. Homicide § 12—**

Under his plea of not guilty defendant may present evidence that he acted in self-defense or that the shooting was accidental, or both, since defendant may rely upon more than one defense and is not required to make an election.

STATE *v.* TODD.

**4. Homicide § 27—**

　　Where defendant contends upon supporting evidence that he was without fault in bringing on the difficulty, that deceased was holding a pistol pointed toward him and his wife and child, and that he advanced on deceased keeping himself between deceased and his wife and child for the protection of his wife and child and, because of threats made by deceased and his reputation for violence, feared that deceased would inflict great bodily harm or death upon himself or his wife or child, and shot deceased, the evidence requires the court to declare and explain defendant's right to kill in defense of self or his wife and child upon necessity, real or apparent.

**5. Criminal Law § 107—**

　　It is the duty of the court to charge the jury upon each substantial and essential feature of the case arising upon the evidence notwithstanding the absence of prayer for special instructions.

APPEAL by defendant from *Clark, S. J.,* October 1964 Regular Criminal Session of BLADEN.

Criminal prosecution upon an indictment charging defendant with murder in the first degree of Jerry Earl Cain. G.S. 14-17; G.S. 15-144. When the case was called for trial, the prosecuting officer for the State announced he would ask for a verdict of guilty of murder in the second degree.

Plea: Not guilty. Verdict: Guilty of voluntary manslaughter.

From a judgment of imprisonment, defendant appeals.

*Attorney General T. W. Bruton, and Assistant Attorney General Charles W. Barbee, Jr., for the State.*

*Robert J. Hester, Jr., and James R. Nance for defendant appellant.*

PARKER, J. The undisputed evidence presents these facts: On 24 May 1964 defendant and Elmer Guyton were operating on N. C. Highway #211, about one mile east of the town of Bladenboro, a cafe or grill, serving food and drink inside and also rendering curb service. The cafe or grill building was located about 100 feet off the highway, and there was parking space for 30 cars between the building and the highway. Defendant and Guyton had bought the place four days before then. Before 7 p.m. on 24 May 1964, defendant, his wife, and his three children, aged nine, seven, and three years, went to the cafe. When he arrived his 18-year-old sister, Patsy Todd, was there cooking and waiting on cars, and also there waiting on cars was Emily Holden, a 17-year-old-girl. Later that evening Jerry Earl Cain, 18 years old, was sitting in Phillip Little's 1957 Oldsmobile parked in front of the cafe. They had had a drink of "stumphole liquor." Between 7 and 8 p.m. Emily Holden came out of the cafe and got in a car occupied by Clifford Cashwell and Patsy Todd. She and Cain had been going together.

From this point on there is conflict in the State's evidence and defendant's evidence as to the crucial facts of what occurred.

The State's evidence tends to show these facts: Cain went to the Cashwell car, and he and Cashwell had an argument. Emily Holden got out of the Cashwell car. Cain took her wrist and told her not to get back in it. She told Cain he did not own her, and walked back into the cafe. Defendant Todd walked up and, without saying a word to Cain, knocked him down with his fist. Defendant told Cain to leave his place. Cain got up, walked to, and got in Little's car. Defendant came to Little's car, caught Cain's foot, and partially dragged him out of the car. He pulled off one of Cain's shoes. Then defendant slammed the car door shut, threw the shoe in the car, and Little drove off with Cain in the car. Emily Holden testified in rebuttal to the effect that Cain did not hurt her arm, and that she did not leave the Cashwell car screaming and crying. Little drove his car to Luther Berry's grill about a mile from defendant's grill. Two or three times later that evening he, with Cain in the car, drove by defendant's cafe, and went back to Berry's grill. Bobby Harrelson, who was in defendant's grill eating a hamburger, testified that defendant, after they had passed by two or three times, made the following statements: "He was going to teach them a lesson like he did the rest. If he couldn't learn them one way, he would learn them another. * * * So he said, 'Well, I am going uptown and get the law,' or something like that. He said, 'If the law won't do anything about it, I will.'" About 9:00 or 9:30 p.m. that night, Cain, Little, Mitchell Tickles, and Johnny McKeithan were sitting in Little's car parked at Berry's grill. All four had been drinking "stumphole liquor." Little was behind the steering wheel and Cain was to his right beside him. The car was pointed to the highway. Defendant drove by one time, came back, and parked his car 30 or 40 feet from them. His wife and three-year-old child were in the front seat with him. He got out of his car carrying a double-barreled shotgun about waist high, walked up to Little's car, and said, "Let's see the gun." Cain replied, "We ain't got no gun." Defendant stuck the gun in the open window of the car pointed right at Cain's face, pulled the trigger, and shot Cain. The shotgun blast blew out Cain's right eyeball, and made a hole in his face and head large enough to stick a fist in it. Mitchell Tickles testified: "I got out and asked Roy Lee Todd why he shot him and he didn't say nothing. He just looked at me." Defendant's wife and youngest child got out of the car. Defendant and William Delbert Smith placed Cain's body in defendant's car, and they left at high speed for a hospital in Lumberton. On arrival Cain was dead. On the trip to Lumberton, defendant threw the gun out of the window into Big Swamp. Charles Edgar Bullard rode back to Bladenboro from the hospital with

defendant that night. He testified as to the following conversation between defendant and himself: "He told me that the only way he could get out of this was that I seen them boys shoot at him three times with a pistol, and I hadn't seen none of that. * * * When he said the only way that he could get out of this was for me to say I seen them boys shoot at him three times with a pistol I told him that I would. I was scared, because I was thinking he might shoot me or something."

Defendant's evidence tends to show the following facts: Cain grabbed Emily Holden's arm, snatched her out of Cashwell's car, and slapped her. She screamed and ran toward the grill. Defendant heard her screaming and came out of the grill. Defendant went to Cain and told him, "I have just started this place, and I have got to keep it in order." Cain made a "swing" at defendant, and defendant slapped him down. Cain got up and "came right back" at defendant, and defendant slapped him down again. Defendant told Phillip Little to carry Cain away, and not to bring him back that night, because Cain was too drunk to be there. Cain got in Little's car and Little started to leave, but stopped. Cain stuck his head out of the window, and said to defendant: "You s. o. b. — mark my word — I might leave, but I will be back. You will never live to see the sun rise tomorrow." Then they drove away toward Bladenboro. In 10 or 20 minutes Little, with Cain as a passenger, drove by the grill headed toward Clarkton. Defendant asked Cashwell if he had a shotgun he could lend him to protect his place of business. Cashwell replied he could. Cashwell drove home to water his cows, got his double-barreled shotgun and a box of shells, and returned to defendant's grill around 8 p.m. Upon arrival he gave the shotgun and box of shells to defendant, who carried them into the grill.

A little later that night defendant drove his car to Carsey Davis's place in Bladenboro to get change for a ten dollar bill. On the way Little's Oldsmobile drove up behind him, and kept about ten feet behind him. When he reached Davis's place, he stopped by the gas tanks, and Little's car stopped across the street in front of Bridgers' Motor Company. He went in Davis's place, got change for his ten dollar bill, and came out and got in his car. Little, Cain, and Mitchell Tickles were in the Little car. Someone from the Little car said, "Wait a minute, you s. o. b., let's settle that now." He started back to his grill. Little's car followed him. At that time Little was driving, Tickles was in the middle sitting beside him, and Cain was beside Tickles on the outside. He turned into his grill. Little drove by, made a "tail spin" throwing rocks all over his building, and started back to Bladenboro. All of them were hollering. Later, Little, with Cain and Tickles as passengers, drove by his grill as many as fifteen times, sometimes at a speed of 30 miles an hour, sometimes at 15 miles an hour, and in passing they were

cursing and saying, "Get out on the road, you s. o. b. Let's see how damned brave you are now."

About 9 p.m. defendant, his wife, and three-year-old child got in his car — all three on the front seat with the child in the middle — and he started to his home in the direction of Clarkton. When he had driven down the highway about 200 feet, Little's car came up behind him, and a pistol fired three times out of its right window. His wife fell down on the floorboard, and he shoved the child down. Little's Oldsmobile passed him in the direction of Clarkton. As it passed, he recognized Little as its driver. He turned around and went back to his grill.

He got the shotgun and box of shells, placed them in his car, and, with his wife and three-year-old child as passengers, drove to the police station in Bladenboro to get a warrant and police protection, because he was scared they would shoot his wife, his child and him. Upon arrival at the police station, no officer was there. He stayed there about seven minutes. He then drove to Pelo's drive-in thinking a police officer or deputy sheriff might be there. He found no officer there, drove back to the police station, and found no officer there. He stayed about 15 minutes. He then drove to Berry's grill to see if an officer was there. When he parked there, he did not know Little's automobile was there, parked back off the highway.

When he got out of his car and was standing by the door, Cain, who was sitting in the front seat of Little's car on the right side with Tickles and Little to his left, said, "Wait a minute, you s. o. b. — now, this is where we are going to settle this." He turned his head, and saw Cain with a black pistol in his hand pointed toward his chest. He was scared to death. He reached in his car, grabbed the shotgun with the barrel in his left hand, and started walking toward the Little car, keeping his body between the pistol and his wife and child. As he was walking, he said, "Boys, I am not mad with you all. Don't be mad with me. Let's forget this here right where it is at. Let's don't let it go no further." Cain was cursing. When he got within three feet of the Little car, Cain was holding the pistol pointed toward his chest, and he was holding the shotgun about five inches below the window. When he made another step toward the car, Tickles, who was sitting beside Cain with his hand out of the open window, grabbed his shotgun, jerked it in the car, and it fired. Defendant testified: "God in heaven knows that I did not ever pull that trigger on the shotgun. I do not know what caused the gun to go off, except the jarring of it. My index finger on my right hand was setting right behind the trigger on the barrel. * * * I never consciously pulled the trigger to that gun. * * * I had never loaded that gun, but Cliff [Cashwell] said it was loaded. * * * I knew the general reputation of Jerry Cain for danger and violence in

the community in which he lived and it was bad." On cross-examination he testified as follows: "I would walk in between my wife and youngun and get blowed half in two before I would let them get killed. * * * I walked the gun about 40 feet facing a man who I said had a pistol pointed in my bosom because I was scared of him. * * * So far as the shooting was concerned it was completely accidental. * * * I took the gun and advanced on him because I got a wife and youngun setting over there. I walked in between them, because my car was setting, and they had that gun. If they had shot, it would have come right through the car and killed my wife and youngun. You would have done it. Anyone in this Courthouse would have done the same thing I did. I took the gun out of the car because I was scared of him. I walked 40 feet toward him with a drawn gun pointed in his direction because he had a gun on me. All I was doing was trying to talk him out of it. * * * And the gun was pointed right towards me, and I was looking every step I took to get blowed right half in two."

W. E. Blackley, a State highway patrolman, testified that Cain had a bad general reputation in the community where he lived for fighting and acts of violence when he was drinking.

The State's evidence was amply sufficient to carry the case to the jury on the charge of murder in the second degree — an intentional killing of Cain by defendant with a deadly weapon, to wit, a shotgun. When an intentional killing of a person with a deadly weapon is admitted judicially in court by a defendant or is proven by the State's evidence, the law raises two presumptions against the killer: First, that the killing was unlawful; and, second, that it was done with malice; and an unlawful killing with malice is murder in the second degree. But the jury alone may determine whether an intentional killing has been established where no judicial admission of the fact is made by the defendant, as none was made here. *S. v. Gregory,* 203 N.C. 528, 166 S.E. 387; *S. v. DeGraffenreid,* 223 N.C. 461, 27 S.E. 2d 130; *S. v. Phillips,* 229 N.C. 538, 50 S.E. 2d 306; *S. v. Mangum,* 245 N.C. 323, 96 S.E. 2d 39; *S. v. McGirt,* 263 N.C. 527, 139 S.E. 2d 640. The law then casts upon the defendant the burden of showing to the satisfaction of the jury, if he can do so — not by the greater weight of the evidence nor beyond a reasonable doubt, but simply to the satisfaction of the jury — from all the evidence, facts and circumstances, the legal provocation that will rob the crime of malice and thus reduce it to manslaughter, or that will excuse it altogether upon the ground of self-defense. "The burden is on the defendant to establish such facts to the satisfaction of the jury, unless they arise out of the evidence against him." *S. v. Quick,* 150 N.C. 820, 64 S.E. 168; *S. v. Gregory, supra* (which quotes with approval the above quotation from the *Quick* case); *S. v. Keaton,* 206

N.C. 682, 175 S.E. 296 (which quotes with approval the above quotation from the *Quick* case); *S. v. Beachum,* 220 N.C. 531, 17 S.E. 2d 674; *S. v. Jernigan,* 231 N.C. 338, 56 S.E. 2d 599; *S. v. Mangum, supra; S. v. McGirt, supra.* The legal provocation that will rob the crime of malice and thus reduce it to manslaughter, and self-defense, are affirmative pleas, with the burden of satisfaction cast upon the defendant. *S. v. McGirt, supra; S. v. Jernigan, supra; S. v. DeGraffenreid, supra; S. v. Beachum, supra.*

"The defendant's plea of not guilty entitled him to present evidence that he acted in self-defense, that the shooting was accidental, or both. Election is not required. The defendant may rely on more than one defense." *S. v. Wagoner,* 249 N.C. 637, 107 S.E. 2d 83.

Defendant contends that the evidence, and particularly his evidence, before the jury shows that he was free from fault in bringing on the circumstances that led to the killing of Cain, and was sufficient to present the question as to whether he acted in his own self-defense, or in defense of his wife and three-year-old child, or in defense of all three of them, upon necessity, real or apparent, in killing Cain, and also the question as to whether the killing of Cain was unintentional — the result of an accident. He assigns as error this part of the charge: "The defendant in answer to the charge against him relies on the defense known in law as the plea of accident or misadventure," on the ground that it deprived him of his defense of self-defense arising on the evidence. Nowhere in the charge did the court instruct the jury in respect to defendant's plea of self-defense arising on his evidence.

Stacy, C. J., speaking for the Court, said in *S. v. Marshall,* 208 N.C. 127, 179 S.E. 427:

> "The right to kill in self-defense or in defense of one's family or habitation rests upon necessity, real or apparent, and the pertinent decisions are to the effect:
>
> "1. That one may kill in defense of himself, or his family, when necessary to prevent death or great bodily harm. [Citing authority.]
>
> "2. That one may kill in defense of himself, or his family, when not actually necessary to prevent death or great bodily harm, if he believes it to be necessary and has a reasonable ground for the belief. [Citing authority.]"

We hold defendant's evidence in the case was sufficient to require the court to declare and explain the law arising on his evidence tending to show that he killed Cain in self-defense, or in defense of his wife and three-year-old child, or in defense of all three of them, upon necessity,

real or apparent. As this defense of self-defense was a substantial and essential feature of the case arising on defendant's evidence, no special prayers for instructions were required, and the judge's failure to charge with respect thereto was prejudicial error, and entitles defendant to a new trial. *S. v.. Wagoner, supra; S. v. Brady,* 236 N.C. 295, 72 S.E. 2d 675; *S. v. Ardrey,* 232 N.C. 721, 62 S.E. 2d 53.

*S. v. Crisp,* 244 N.C. 407, 94 S.E. 2d 402, is distinguishable. In that case one of defendant's counsel stated during the trial that defendant did not plead self-defense, and defendant stated in his brief that defendant has contended at all times that the shooting was accidental.

New trial.