STATE OF NORTH CAROLINA v. SAMUEL NICK MOORE

No. 4

(Filed 9 April 1969)

1. Homicide § 21— first degree murder — nonsuit

State's evidence *is held* sufficient to be submitted to the jury on the issue of defendant's guilt of murder in the first degree of his wife.

2. Homicide § 4— elements of first degree murder

Murder in the first degree is the unlawful killing of a human being with malice, premeditation and deliberation. G.S. 14-17.

**3. Homicide § 4— elements of first degree murder**

The three essential elements of murder in the first degree — premeditation, deliberation and malice — concur if defendant resolved in his mind a fixed purpose to kill his wife and thereafter, because of that previously formed intention and not because of any legal provocation on her part deliberately and intentionally shoots her.

**4. Homicide § 4— elements of first degree murder — malice**

Malice exists as a matter of law whenever there has been an unlawful and intentional homicide without excuse or mitigating circumstances.

**5. Homicide §§ 17, 18— first degree murder — evidence of malice and premeditation**

In a prosecution for murder in the first degree, evidence that just a few minutes before his wife was shot defendant had announced his intention to kill her tends to show premeditation and deliberation as well as malice.

**6. Homicide § 15; Criminal Law § 34— first degree murder — competency of evidence — prior assaults on victim**

In a prosecution charging defendant with the first-degree murder of his wife, evidence that on various occasions during approximately three and one-half years prior to her death defendant had intentionally inflicted personal injuries upon his wife is admissible as bearing on intent, malice, motive, premeditation and deliberation on the part of defendant.

**7. Homicide § 15; Criminal Law § 34— first degree murder — competency of evidence — prior assault on third person**

In a prosecution charging defendant with the first degree murder of his wife, evidence of defendant's fight with another person at a county fair some two and one-half years prior to the homicide is admissible where the fight immediately preceded and precipitated defendant's attack upon his wife.

**8. Constitutional Law § 31— right of confrontation of witnesses**

The right of confrontation guaranteed to every defendant in a criminal prosecution affirms the common law rule that the witnesses must be present before the triers of fact and the accused so that they are put face to face, and also includes the more important privilege of defendant's being present in person at every stage of the trial. N. C. Constitution, Art. I, § 11; U. S. Constitution, VI and XIV Amendments.

**9. Constitutional Law § 37— defendant's waiver of right to be present at trial — capital felony**

An accused cannot waive his right to be present at every stage of his trial upon an indictment charging him with a capital felony.

**10. Constitutional Law § 37— waiver of right to confront witnesses — non-capital felonies and misdemeanors**

The right of accused to confront the State's witness is a personal privilege which he may waive either by express consent or by a failure to assert in apt time.

**11. Constitutional Law § 37— waiver of right to confront witnesses — capital case**

Even in a capital case the constitutional right of an accused to be confronted by the witness against him is a personal privilege which he may waive.

**12. Homicide § 27— instructions on voluntary and involuntary manslaughter**

In a prosecution charging defendant with the homicide of his wife, issue of defendant's guilt of voluntary manslaughter does not arise where there is no evidence that (1) defendant killed his wife while fighting in self-defense or that (2) defendant killed her in the heat of passion; but issue of involuntary manslaughter does arise where defendant's testimony would support a finding that his culpable negligence in handling a shotgun caused her death.

**13. Criminal Law § 115— instructions on lesser degrees of the offense charged**

Where there is evidence of defendant's guilt of a lesser degree of the crime charged in the indictment, the court must submit defendant's guilt of the lesser included offense to the jury; if he fails to do so, the error is not cured by a verdict convicting defendant of the offense charged.

**14. Homicide § 11— defense — accidental killing**

A defendant's assertion of accidental killing is not an affirmative defense.

**15. Homicide § 14— burden of proof of unlawful slaying**

In a prosecution for unlawful homicide, the burden is always on the State to prove an unlawful slaying.

**16. Homicide §§ 21, 27— instructions on involuntary manslaughter — sufficiency of evidence**

In a prosecution charging defendant with the homicide of his wife, defendant is entitled to have the specific question of his guilt of involuntary manslaughter submitted to the jury where his testimony is to the effect that as he was leaving the home with clothes over his left arm and a rifle and shotgun underneath his right arm, defendant "throwed the guns over his left arm" to reach with his right for cigarettes on a table and that a gun went off.

**17. Homicide § 6— involuntary manslaughter — reckless use of firearms**

One who handles a firearm in a reckless or wanton manner and thereby unintentionally causes the death of another is guilty of involuntary manslaughter.

**18. Criminal Law § 89— impeachment of negative testimony**

In a prosecution for first degree murder, where defendant's witness denied on cross-examination that defendant told him on the day of the homicide that he had shot his wife, it was error to allow the State to offer for purpose of impeachment and contradiction the testimony of a deputy sheriff as to what the witness told him defendant had said.

**19. Criminal Law § 89— impeachment of negative evidence**

If a party interrogates a witness about a fact which would be favorable to the examiner if true, and receives a reply which is merely negative in its effect on examiner's case, the examiner may not by extrinsic evidence prove that the first witness had earlier stated that the fact was true as desired by the enquirer.

APPEAL by defendant from *Cowper, J.,* 19 August 1968 Regular Criminal Session of BEAUFORT.

Defendant was tried and convicted upon an indictment which charged that, on 7 March 1968, he "feloniously, wilfully, and of his malice aforethought, did kill and murder Joanne Woolard Moore," his wife. Upon the jury's recommendation the court imposed the mandatory life sentence. Defendant appealed, assigning as error the court's failure to allow his motion for nonsuit, the admission of certain evidence, and portions of the charge.

*Robert Morgan, Attorney General; Ralph Moody, Deputy Attorney General, for the State.*

*Tharrington & Smith and McMillan & McMillan for defendant appellant.*

SHARP, J.

Defendant's assignments of error 1 and 2 are that the court erred in overruling his motions for nonsuit. In his brief he argues that the court should have entered "a judgment of nonsuit as to the offenses of first and second degree murder."

Evidence for the State tended to show: On 7 March 1968, defendant and Joanne Woolard Moore (Joanne) had been married nine years; they had three children, aged 6 years, 4 years, and 14 months. The family was living in a trailer about 200 yards from the home of Joanne's parents, Mr. and Mrs. Bill Woolard. The two older children spent the night of 6 March 1968 with their grandparents. The following morning, soon after 7:30, defendant telephoned his mother-in-law and said: "Mrs. Woolard, I am going to kill myself and Joanne. Come up and get the baby." When Mrs. Woolard attempted to remonstrate with him, he said, "Yes, Ma'am," and hung up. After attempting to telephone defendant's two brothers, Mrs. Woolard finally reached her husband at work. About 20-25 minutes after his telephone call, defendant appeared at Mrs. Woolard's door with the baby. Defendant appeared nervous and angry, and the child was unwrapped. He said that he couldn't talk to

Joanne because of the baby's crying and that he was going back to the trailer to talk to her. He then left in his truck.

Mrs. Woolard immediately rang her daughter's telephone 12-15 times but got no answer. After again telephoning her husband she went to the trailer and entered the living room about 8:15 a.m. There she first saw a man's bloody tracks "headed down toward the bedroom" to the left. When she looked to the right and saw Joanne's body on the kitchen floor, she fled screaming from the trailer. Her screams awakened Mrs. Marie Beddard, who lived across the road. Leaving Mrs. Woolard at her house, Mrs. Beddard went to the trailer. She saw Joanne, clothed in a robe and bedroom slippers, lying on her back in a pool of blood behind the bar, which separated the kitchen and the living room. The right side of her face and head had been blown away. Mrs. Beddard went back to her house and procured a friend to call the sheriff and the rescue squad.

Within minutes thereafter, Mr. Woolard and a companion arrived at the trailer. The sheriff arrived between 8:30 and 8:45 a.m. The odor of gunpowder pervaded the trailer. He followed the bloody footprints, which led from the body, across the living room into the first bedroom. On the bed was a 12-gauge Remington shotgun (State's Exhibit 5), containing two live shells. Behind the sofa in the living room he found an empty shotgun shell (State's Exhibit 9). Blood, hair, and brain tissue were on the ceiling and all over the kitchen area.

In the opinion of E. B. Pearce, Ballistics Expert of the S. B. I., the shell (Exhibit 9) had been fired from the shotgun (Exhibit 5). The doctor who examined the body at 11:40 a.m. found no powder burns on the face. In his opinion, death, which was instantaneous, had resulted from a gunshot wound.

On the morning of 7 March 1968, at 7:45, William King went to work shrubbing a ditch behind the trailer. A few minutes thereafter, he saw defendant leave the trailer with the baby in his arms and drive to the Woolard residence. He observed that defendant remained there "just a few minutes" and then returned to the front of the trailer, where he disappeared from King's view. In a few minutes he saw defendant leave again and drive toward Griffin's store, which is about 2½ miles from the trailer in the opposite direction from the Woolard home. About 8:10 a.m. defendant entered Griffin's store and purchased two packs of cigarettes. Griffin noticed nothing unusual in his appearance.

Defendant was arrested at 1:55 a.m. on Saturday, 9 March 1968, in the Washington Police Station.

Sometime after Christmas 1967, defendant had told Mr. and Mrs. Woolard that if Joanne ever left him he would kill her. On the Monday night preceding 7 March 1968, defendant made a similar statement to Mr. and Mrs. Bullock. On Wednesday afternoon, 6 March 1968, defendant went to Bullock's place of employment and informed him that he had some time facing him and that he would be in jail before Monday morning. Bobby Harmon, who was present on Wednesday afternoon when defendant talked to Bullock, testified as a witness for defendant that defendant said "he was in a little trouble"; that he was on probation and if his wife got a warrant for him he would be locked up before Monday morning.

The State introduced — over defendant's objection — evidence tending to show: (1) On one occasion during watermelon time in 1965, defendant had slapped his wife several times, knocked her down, torn her clothes from her body down to the waist, and "snatched her out on the porch by the hair of her head"; (2) In October 1965, at the close of the Beaufort County Fair, after he got into a fight with a man named "Butterball," defendant became incensed because his wife had thrown away the pistol he gave her to hide. He beat her and knocked her to the ground, where he tore off her blouse. A highway patrolman found her there unconscious. The next morning, when defendant got out of jail, he found Joanne at the home of his mother and hit her again in the presence of his mother; (3) On 23 December 1967, defendant hit Joanne in the side with a bottle of whiskey and beat her in the face until she fell unconscious to the floor from the sofa. The next day her face and arms were badly bruised; (4) On Saturday night, 2 March 1968, at a restaurant, where defendant and his wife were eating with Mr. and Mrs. Clarence Bullock, defendant took two gasoline credit cards from his wife's purse, tore them up, and said that he was going to put a stop to her going so much. He also took her wallet. (5) On Sunday morning, 3 March 1968, the woman who lived directly across the highway from the Moore trailer heard Joanne give three or four loud screams. That afternoon Mrs. Bullock observed that Joanne's eyes were bruised and that a cut on her nose was bleeding. Defendant told Clarence Bullock that he had whipped his wife that morning. The following Monday her eyes were black and her face swollen.

The admission of the foregoing testimony is the basis of defendant's assignments of error Nos. 27, 29, 34, and 35.

On 5 August 1968, fourteen days prior to the commencement of

the term at which defendant was tried, the solicitor for the State and defendant, individually and by his counsel, stipulated that Dr. Clyde Potter, a physician and surgeon, if present, would testify that on Wednesday, 6 March 1968, he examined Joanne Moore's face; that she had two black eyes and her nose was severely bruised, swollen, and sore. The parties also stipulated that this statement could be admitted in evidence without objection during defendant's trial. When the State offered the stipulation in evidence, defendant objected — not "to the form of the statement" — but "to the evidence contained therein." The admission of the foregoing stipulation constitutes defendant's assignment of error No. 41.

The testimony of defendant as a witness for himself tended to show: During nine and a half years of married life he and Joanne had had only "a few minor quarrels"; that he had always loved his wife and had never threatened to harm her. He had never beaten her, blacked her eyes, knocked her unconscious, or torn her clothes from her person. He had, however, slapped her with his open hand on two occasions: (1) at the fair in October 1965 because, instead of putting his pistol in the automobile as he had directed, she had thrown it in a ditch and lost it; and (2) on 23 December 1965, when she had insisted upon going with Mr. and Mrs. Clarence Bullock to Rocky Mount, when the four of them had been drinking. On 3 March 1968, he had had to fight her when she attacked him, and she got a black eye. The night before, he had torn up Joanne's credit cards because she was charging too much gas. That night he slept on the sofa in the living room. About 6:30 a.m., in attempting to get into bed, he awakened Joanne, who accused him of being out all night. She began to fight and in order to protect himself, he jumped back, and she fell off the bed. She herself had scratched her nose on her diamond engagement ring. The next day, in consequence of this set-to, she had two black eyes. At her request, he bought her sunglasses. He also gave her credit cards to replace the two he had destroyed, and there was no argument between them on Monday. On Tuesday, he took a trailer to Virginia. On Wednesday evening, upon his return, she told him she had been to see Dr. Potter and had consulted an attorney, Mr. LeRoy Scott. He did not know what Joanne wanted. Her mother wanted her to leave him, but Joanne did not want separation papers. He was not angry with his wife, and they had slept together that night. The next morning, however, he told her she must decide during the day whether she wanted him or her mother. He directed her to call him at his mother's that night and give him her decision.

From the bedroom closet he removed several suits, a rifle, and a shotgun, which he had decided to sell to repay some company money he had spent. He put the clothes over his left arm and the guns underneath his right arm and started to take the articles out to his truck while Joanne finished cooking his breakfast. As he walked down the little hall into the living room, he saw a pack of cigarettes on a little table to his right. Joanne was then standing in front of the stove 12-15 feet away cooking his breakfast. She was facing him. He "throwed the guns" over his left arm and reached with his right for the cigarettes. The gun went off, and he "didn't know who it hit." He did not intentionally shoot his wife. The baby cried, and before the smoke cleared he went to it. After that he remembers nothing until about midnight, when he found himself in West Virginia. He does not know how long he stayed there but, "realizing what had happened," he decided to come on back home. He arrived late at night and went to the police station.

On the morning of 7 March 1968, defendant went to the home of his brother, Ray Moore (Ray) about 8:30 and borrowed $12.00 from him. Ray described defendant as pale, very excited, and in a state of shock. As he left, Ray asked him where he was going, and he said he did not know.

On cross-examination, defendant testified that he had been convicted of breaking and entering, reckless driving, speeding, simple assault, resisting arrest, assault with a deadly weapon, drunken driving, manufacturing whiskey, forcible trespass, and being drunk and disorderly.

After three two-hour examinations of defendant, made in April and June 1968, Dr. Thomas E. Curtis, a psychiatrist employed by defendant, came to the conclusion that on the morning of 7 March 1968, defendant had suffered the blackout which he had described and that, to have suffered such a "traumatic blackout," defendant "would have had to have known that the discharge from his gun had hit his wife."

Other evidence for defendant tended to show: On each occasion upon which witnesses for the State had testified that they had observed cuts or bruises upon the person of Joanne, members of defendant's family had also seen her and had observed no wounds, discolorations, or anything unusual about her appearance.

[1-4]  The preceding resumé demonstrates the sufficiency of the evidence to withstand defendant's motions for nonsuit and to sustain the jury's verdict of murder in the first degree. Murder in the

first degree is the unlawful killing of a human being with malice, premeditation, and deliberation. G.S. 14-17; *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769, *cert. denied,* 368 U.S. 851, 7 L. Ed. 2d 49, 82 S. Ct. 85. If defendant resolved in his mind a fixed purpose to kill his wife and thereafter, because of that previously formed intention, and not because of any legal provocation on her part, he deliberately and intentionally shot her, the three essential elements of murder in the first degree — premeditation, deliberation, and malice — concurred. "Malice is not only hatred, ill-will, or spite, as it is ordinarily understood — to be sure that is malice — but it also means that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." *State v. Benson,* 183 N.C. 795, 799, 111 S.E. 869, 871. Malice exists as a matter of law "whenever there has been an unlawful and intentional homicide without excuse or mitigating circumstance." *State v. Baldwin,* 152 N.C. 822, 829, 68 S.E. 148, 151.

[5] The transcript contains plenary evidence from which the jury could find that defendant, motivated by ill will and express malice toward his wife, shot her with deliberation after having premeditated the deed. The evidence that, just a few minutes before she was shot, defendant had announced his intention to kill her, tended to show premeditation and deliberation as well as malice. Defendant's motions for nonsuit were properly overruled, and defendant was not entitled to an instruction that he was guilty of murder neither in the first nor in the second degree.

[6] The evidence that, on various occasions during approximately three and one-half years prior to her death, defendant had intentionally inflicted personal injuries upon his wife "was admissible as bearing on intent, malice, motive, premeditation and deliberation on the part of the prisoner." *State v. Gales,* 240 N.C. 319, 82 S.E. 2d 80. See *State v. Horne,* 209 N.C. 725, 184 S.E. 470. In *State v. Kincaid,* 183 N.C. 709, 110 S.E. 612, the trial judge admitted evidence tending to show the defendant's maltreatment of his wife "during a period of several years next preceding her death." Upon appeal, this Court said, "The evidence was offered for the purpose of showing intermediate and recurring misconduct of the defendant, and while its weight was to be determined by the jury, the question of its competency was properly decided by the court." *Id.* at 716, 110 S.E. at 616. The opinion quoted, and adopted, the following rationale of Justice Nash in *State v. Rash,* 34 N.C. 382, 384:

"Ordinarily, the eye of suspicion cannot turn upon the husband as the murderer of his wife; and when charged upon him, in the

absence of positive proof, strong and convincing evidence — evidence that leaves no doubt on the mind that he had towards her that *mala mens* which alone could lead him to perpetrate the crime — is always material. How else could this be done than by showing his acts toward her, the manner in which he treated her, and the declarations of his malignity? . . . In the domestic relation, the malice of one of the parties is rarely to be proved but from a series of acts; and the longer they have existed and the greater the number of them, the more powerful are they to show the state of his feelings. A single expression and a single act of violence are most frequently the result of temporary passion, as evanescent as the cause producing them. But a long continued course of brutal conduct shows a settled state of feeling inimical to the object. . . . [M]alice may be proved as well by previous acts as by previous threats, and often much more satisfactorily."

In *State v. Creech*, 229 N.C. 662, 51 S.E. 2d 348, the defendant, indicted for the murder of his wife, "contended that the court erred in allowing the prosecution to go back over his entire married life with the deceased" (8 years) "to show frequent quarrels, separations, reconciliations and ill-treatment of deceased by defendant throughout most of their married life." Stacy, C.J., speaking for the Court, said, "This evidence was competent as tending to show malice on the part of the defendant or a settled state of feeling inimical to the deceased, and the decisions so hold." *Id.* at 670, 51 S.E. 2d at 354. *Accord, State v. Ray*, 212 N.C. 725, 729, 194 S.E. 482, 484; *State v. Allen*, 222 N.C. 145, 22 S.E. 2d 233.

In *State v. Hawkins*, 214 N.C. 326, 199 S.E. 284, the defendant contended evidence, that for 3-4 years prior to her death he had beaten, bruised, and whipped his wife, was too remote. "The remoteness goes to the weight, and not to the competency of the testimony," said the Court. *Id.* at 333, 199 S.E. at 288.

[7]    The evidence of defendant's fight with Butterball at the county fair in October 1965, had it been an isolated instance, would clearly have been incompetent. *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364. This fight, however, immediately preceded and precipitated defendant's attack upon his wife. It was a component of the same aggressive action, and its admission was not error.

Defendant's assignments of error Nos. 27, 29, 34 and 35 are overruled.

Defendant's assignment of error No. 43 attacks the introduction of the stipulation with reference to the testimony which Dr. Potter

was prepared to give. Defendant concedes (1) that he and his three attorneys signed the writing which stipulated that if Dr. Potter were present at the trial he would testify that on the day before her death Joanne's face was cut and bruised and that the stipulation could be admitted in evidence without objection, and (2) that at the trial he objected "to the evidence contained therein" and not to the form of the statement. Yet he now asserts that he is entitled to a new trial because the "constitutional right of confrontation" cannot be waived in a capital case.

[8]   N. C. Const. Art. I § 11 provides: "In all criminal prosecutions, every person charged with crime has the right to be informed of the accusation and to confront the accusers and witnesses with other testimony. . . ." The Sixth Amendment to the U. S. Constitution, made obligatory upon the states by the Fourteenth Amendment, gives an accused this same protection. *Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965). The provision affirms the common-law rule that the witness must be present before the triers of fact and the accused so that they are " 'put face to face.' " *State v. Dixon,* 185 N.C. 727, 117 S.E. 170. It also includes "the more important privilege of being present in person" at every stage of the trial. *State v. Hartsfield,* 188 N.C. 357, 360, 124 S.E. 629, 631.

[9, 10]   While it is well established in this State that an accused cannot waive his right to be present at every stage of his trial upon an indictment charging him with a capital felony, *State v. Ferebee,* 266 N.C. 606, 146 S.E. 2d 666, and cases cited therein, this Court has not heretofore answered the question whether a defendant in a capital case can waive his right to be confronted with the witnesses against him. The cases upon which defendant bases his contention that he cannot waive this right either relate to a *defendant's presence* (or temporary absence) at the trial or were prosecutions for misdemeanors. In appeals involving misdemeanors and felonies less than capital, this Court has said that the right for accused to confront the State's witness is a personal privilege which he may waive either by express consent or by a failure to assert in apt time. *State v. Hartsfield, supra; State v. Mitchell,* 119 N.C. 784, 25 S.E. 783. *See also Miller v. State,* 237 N.C. 29, 74 S.E. 2d 513. On this point, "The authorities are practically uniform." Annot., 129 Am. St. Rep. 23, 45 (1908); *accord,* 23 C. J. S. *Criminal Law* § 1009 (1961). The rationale is that the court's power to try a defendant is not dependent upon his exercise of his constitutional right to be confronted by the State's witness. This right is a personal privilege

for the benefit of the accused which does not affect the general public. *The State v. Polson,* 29 Iowa 133, 135; *State v. Wagner,* 78 Mo. 644; *Blagg v. State,* 36 Okla. Cr. 337, 254 P. 506; *State v. Mortensen,* 26 Utah 312, 73 P. 562; *Williams v. State,* 61 Wis. 281, 21 N.W. 56. Defendant's presence at his trial for a capital felony, however, is a matter of public as well as private concern, 16 C. J. S. *Constitutional Law* § 9 (1956). Public policy requires his attendance at such a trial.

We agree with the Kentucky court, which pointed out in *Bonar v. Commonwealth,* 180 Ky. 338, 202 S.W. 676, that there are "no sound or other than sentimental reasons" for holding that the privilege cannot be waived where the felony charged is a capital one. In *People v. Dessauer,* 38 Cal. 2d 547, 241 P. 2d 238, *cert. denied,* 344 U.S. 858, 97 L. Ed. 666, 73 S. Ct. 96, a case in which the death penalty was affirmed, the defendant stipulated that the *People's* case might " 'be submitted to the Court on the testimony taken at the preliminary examination' " with the " 'same force and effect as though those witnesses were here, sworn and testified, the defendant waiving his right . . . to be confronted by those witnesses. . . .' " In holding that the defendant had effectively waived his right to confrontation, the court said: "The right to be confronted by witnesses, whether assured by Constitution or statute, may be waived. . . ." *Id.* at 552, 241 P. 2d at 241. *Accord, People v. Schultz-Knighten,* 277 Ill. 238, 115 N.E. 140; *People v. Murray,* 52 Mich. 288, 17 N.W. 843.

In *State v. Mortensen, supra,* the defendant, appealing a death sentence, had stipulated with the prosecution that if a particular witness were present he would give certain testimony upon appeal. To his contention that he could not waive his constitutional right of confrontation, the Utah Supreme Court replied: "The main reason for the confrontation of witnesses is to afford the accused an opportunity for cross-examination, and this is a privilege which he may waive." *Id.* at 326, 73 P. at 566. In *State v. Harris,* 181 N.C. 600, 107 S.E. 466, a case in which this Court affirmed a death sentence, Clark, C.J., said: "The right to confront witnesses necessarily includes the right to cross-examine them, but this is a right which the prisoner's counsel could waive." *Id.* at 605, 107 S.E. at 468.

During the course of the trial of *Commonwealth v. Petrillo,* 340 Pa. 33, 16 A. 2d 50, the defendant, charged with murder, changed his plea of "not guilty" to "guilty." Two other judges were then called in to aid the trial judge in determining the degree of the defendant's guilt and fixing his punishment. With the defendant's ex-

press consent, they considered "the testimony of a cross-examined witness unseen and unheard by them." In affirming a death sentence, the Supreme Court said:

"Appellant's proposition that triers of fact are 'completely incapacitated from judging the credibility of' witnesses they did not see or hear, is untenable. If it were sound, dying declarations and many other forms of hearsay testimony as well as depositions and testimony given on former trials would all have to be excluded in the trial of capital and other criminal cases." *Id.* at 46, 16 A. 2d at 57.

In *Blagg v. State, supra,* in holding that the defendant was bound by his stipulation, the court said it would not do " 'to say that because the state has a peculiar interest in protecting the citizen accused of crime to the extent of his constitutional rights that he shall in no case be allowed to waive them, for in some cases it may be to his interest to waive them, and the denial of the right to do so would defeat the very object in view when the rights were given, and cause them to operate to the injury rather than to the benefit of the accused.' " *Id.* at 343, 254 P. at 508.

[11]   We hold the constitutional right of an accused to be confronted by the witness against him is a personal privilege, which he may waive even in a capital case. Assignment of error No. 43 is overruled.

Defendant assigns as error certain of the court's instructions to the jury (assignments of error 6, 8, 9, 12, 18, 19, and 20). He asserts (1) that the charge as it related to his testimony with reference to the circumstances surrounding his wife's death was an inadequate application of the law pertaining to a killing by misadventure and to manslaughter, and (2) that the court erred in failing (a) to distinguish between the two degrees of manslaughter and (b) to submit to the jury the issue of defendant's guilt of involuntary manslaughter. These assignments must be sustained.

[12]   At the beginning of his charge the judge instructed the jury that it could return a verdict of guilty of murder in the first degree, murder in the second degree, *manslaughter,* or not guilty. Then, after having defined both voluntary and involuntary manslaughter in general terms, the court gave the following mandate:

"[W]hen you come to consider his guilt or innocence on the charge of manslaughter, I instruct you that you should ask yourselves these questions:  1.  Did the defendant shoot and kill his wife, Joanne Moore?  2.  Did he kill her intentionally?  3.  Did he

kill her unlawfully, in the heat of passion, by reason of anger suddenly aroused and before sufficient time had elapsed for passion to subside and reason to resume its sway and habitual control? If you find from the evidence and beyond a reasonable doubt that the truth requires an affirmative answer to all three of these questions; that they should all three be answered 'Yes,' beyond a reasonable doubt, then it would be your duty to convict the defendant of manslaughter in the case. If the State has failed to so satisfy you or if you are not satisfied beyond a reasonable doubt that all three of these questions should be answered 'Yes,' it would be your duty to return a verdict of not guilty to the charge of manslaughter."

The confusion in the foregoing excerpt is manifest. If defendant shot his wife intentionally, he would be guilty of murder in the first degree or murder in the second degree unless he could rebut the presumption of malice arising from an intentional shooting, and thereby reduce the crime to voluntary manslaughter. He could do so only by proving to the jury's satisfaction one of the following defenses: (a) While fighting in self-defense he killed his wife by using excessive force. (If he used no more force than reasonably appeared to him to be necessary to defend himself, he committed no crime.) (b) He killed her in the heat of passion. In the entire transcript there is no evidence of either defense, nor does defendant contend that he killed his wife in self-defense or in the heat of passion. The issue of defendant's guilt of voluntary manslaughter, therefore, does not arise. The issue of involuntary manslaughter, however, is presented since defendant's testimony would support a finding that he did not intentionally shoot his wife but that his culpable negligence caused her death. A charge which made his guilt of *manslaughter* depend upon whether he killed his wife in the heat of passion when there was no evidence of such a killing, but there was evidence that her death resulted from his culpable negligence, constitutes prejudicial error.

If the jury should fail to be convinced beyond a reasonable doubt that defendant intentionally shot his wife, under the evidence presented, the verdict would necessarily be either "guilty of involuntary manslaughter" or "not guilty." Defendant was, therefore, entitled to have the specific question of his guilt of involuntary manslaughter submitted to the jury.

[13] Where there is evidence of defendant's guilt of a lesser degree of the crime charged in the indictment, the court must submit defendant's guilt of the lesser included offense to the jury; if he fails to do so, the error is not cured by a verdict convicting defendant of

the offense charged. *State v. Davis,* 242 N.C. 476, 87 S.E. 2d 906; 3 N. C. Index 2d *Criminal Law* § 115. The reason for the rule was stated by Stacy, C.J., in *State v. DeGraffenreid,* 223 N.C. 461, 463-64, 27 S.E. 2d 130, 132: "[T]he defendant is entitled to have the different views presented to the jury, under a proper charge, and an error in respect of the lesser offense is not cured by a verdict convicting the defendant of a higher offense charged in the bill of indictment, for in such case it cannot be known whether the jury would have convicted of a lesser degree of the same crime if the different views, arising on the evidence, had been correctly presented by the trial court."

**[14, 15]** A defendant's assertion of accidental killing is not an affirmative defense. In a prosecution for unlawful homicide, the burden is always upon the state to prove an unlawful slaying. *State v. Griffin,* 273 N.C. 333, 159 S.E. 2d 889; *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337. If the State is unable to prove an intentional shooting, no presumption of malice arises, and, in order to convict this defendant of unlawful homicide, the State must satisfy the jury beyond a reasonable doubt that defendant's culpable negligence proximately caused the death of his wife. Otherwise, defendant would be entitled to an acquittal.

**[16]** Defendant's testimony, that as he was leaving the trailer with clothes over his left arm and a rifle and shotgun underneath his right arm "he throwed the guns over his left arm" to reach with his right for cigarettes on a table, required the court to submit the issue of his guilt of involuntary manslaughter to the jury. Although defendant does not admit in so many words that he shot his wife, it is implicit in his testimony that she was killed by a discharge from the shotgun which he was handling at the time. His contentions are: (1) The gun discharged accidentally, without design or culpable negligence on his part, and his wife's death was an excusable homicide. (2) If he is criminally responsible for her death, it is solely because he was handling the gun in a culpably negligent manner at the time of its discharge, and the most serious crime of which he could be convicted is involuntary manslaughter.

**[17]** One who handles a firearm in a reckless or wanton manner and thereby unintentionally causes the death of another is guilty of involuntary manslaughter. *State v. Griffin, supra; State v. Brooks,* 260 N.C. 186, 132 S.E. 2d 354. *See also* the authorities cited in the opinions in these two cases.

For these errors in the charge there must be a new trial. We

therefore deem it necessary to discuss only one other (No. 52) of defendant's assignments of error.

**[18]**    Ray Moore, on cross-examination, said that when defendant came by his home on the morning of 7 March he did not tell him that he had shot his wife. Thereafter, over defendant's objection, Deputy Sheriff E. O. Davis, a witness for the State, was permitted to testify that on the morning of 7 March 1968, Ray had informed him that defendant had told Ray there had been a disturbance and Joanne had been shot accidentally; that Joanne had the gun, passed it to defendant, and said, "Shoot me"; and that "during the transaction the gun went off." (Ray returned to the stand to deny making the statement to Davis.)

Davis' testimony as to what Ray Moore told him defendant had said was, of course, *double* hearsay. Stansbury, N. C. Evidence (3d Ed. 1963) § 138. The State contends, however, that it was competent to contradict or impeach Ray. Conceding that Ray's statement was inconsistent with his testimony and that it tended to impeach him, we nevertheless hold it incompetent. Had Ray testified that defendant had made the disputed statement to him, it would have been substantive evidence, competent as an admission. *Id.* at § 167. Ray, however, denied that defendant told him he had shot his wife. This denial did not tend to establish any material fact in the case; it was negative testimony which proved nothing. Yet, by Davis' testimony, to which defendant entered a general objection, the State was given the benefit of hearsay evidence — material but incompetent —, which tended to show that defendant, knowing his wife had been shot after a "disturbance" and in "a transaction" with him, had fled the scene. The judge made no attempt to restrict this evidence to the impeachment of Ray. Had he done so, however, the character of the evidence made it highly improbable that the jury would have restricted it. In short, the prejudicial effect of such evidence outweighs its legitimate use and requires its exclusion.

**[19]**    McCormick, Law of Evidence (1954) § 36 states the rule applicable to the situation here presented: "[I]f a party interrogates a witness about a fact which would be favorable to the examiner if true, and receives a reply which is merely negative in its effect on examiner's case, the examiner may not by extrinsic evidence prove that the first witness had earlier stated that the fact was true as desired by the enquirer. An affirmative answer would have been material and subject to be impeached by an inconsistent statement, but a negative answer is not damaging to the examiner, but merely disappointing, and may not be thus impeached. In this situation, the

policy involved is not the saving of time and confusion, . . . but the protection of the other party against the hearsay use by the jury of the previous statement."

*Miller v. Commonwealth,* 241 Ky. 818, 45 S.W. 2d 461, applies the foregoing rule. Witness *H* was asked if she had not heard the defendant say that he was going to kill deceased. She stated that she had not. The prosecution was then permitted to offer the testimony of witness *J* that *H* told him the defendant had said he was going to kill deceased. In awarding the defendant a new trial, the court said: "[A] witness who fails to testify to substantive facts cannot be contradicted by asking him if he had not stated such facts to another person out of court, and then proving by such person that the witness had made the statements out of court. Such procedure transforms mere hearsay into substantive evidence." *Id.* at 821, 45 S.W. 2d at 462.

An analogous case is *Woodroffe v. Jones,* 83 Me. 21, 21 A. 177. The plaintiff sued for personal injuries sustained in a fall on a defective walk. On cross-examination, the plaintiff's husband, who had given testimony material to her case, was asked if he had not previously warned the plaintiff about wearing high heels. He denied that he had done so. Whereupon, the defendant called a witness who, over objection, testified that the husband had said immediately after the accident " 'that he had told his wife about wearing such high-heeled boots.' " *Id.* at 21, 21 A. at 177. In awarding a new trial for the admission of this evidence, the court said:

"The testimony admitted is incompetent to prove, either that the plaintiff wore high-heeled shoes, or that her husband had cautioned her about wearing them, because it is hearsay; and yet, although it does not tend to prove any material fact in the case, and may, therefore, be said to be immaterial, it is of that mischievous character likely to be taken by the jury to prove both, and cannot be considered harmless. . . . Nor is the testimony admissible as contradicting the denial of the witness, and thereby tending to impeach his credibility; for the witness testified to a negative that had no probative force in the case; and his testimony, sought to be contradicted, was entirely irrelevant and immaterial. . . ." *Id.* at 21-22, 21 A. at 177.

New trial.