No. 69 CR 7303 STATE OF NORTH CAROLINA v. JOHN ANDERSON
HOLLOWAY
— AND —
No. 69 CR 7311 STATE OF NORTH CAROLINA v. PHILLIP JONES
— AND —
No. 69 CR 7310 STATE OF NORTH CAROLINA v. LARRY GREGORY
JONES

No. 6914SC538

(Filed 14 January 1970)

**1. Homicide § 10— defense of father and brother**

A person may lawfully kill in defense of his father and brother when
such action is necessary or reasonably appears to him to be necessary
in order to protect them from death or great bodily harm.

**2. Criminal Law § 115— instructions — submission of lesser degree of
crime charged**

Where there is evidence that would support a lesser degree of the
crime charged in the bill of indictment, a defendant is entitled to have
the question of his guilt of the lesser crime submitted to the jury, G.S.
15-170; if the court fails to do so, the error is not cured by a verdict of
guilty of a higher offense.

**3. Homicide § 14— presumption of malice — intentional use of rifle**

A defendant who intentionally shot the deceased with a rifle is guilty
of murder in the second degree at least unless he can rebut the pre-
sumption of malice arising from the intentional shooting and thereby
reduce the offense to voluntary manslaughter.

**4. Homicide § 14— presumption of malice — rebuttal**

Defendant may rebut the presumption of malice which arises from an
intentional killing with a rifle by proving to the satisfaction of the jury
that he killed the deceased in the heat of passion, or that while exer-
cising his right to defend his family from death or great bodily harm,
he used no more force than was necessary or than reasonably appeared to
him to be necessary.

**5. Homicide § 30— submission of manslaughter — evidence of defense
of family**

Where there is evidence in a first-degree murder prosecution that de-
fendant was acting in defense of his father and brother when he shot the
deceased, the court must submit the question of defendant's guilt of vol-
untary manslaughter to the jury.

**6. Homicide § 2— "aiding and abetting homicide" — instruction on
verdict**

Technically speaking, there is no offense in this State of aiding and
abetting in the offense of murder, and it was therefore unnecessary for
the trial judge in a first-degree murder prosecution to submit an issue of
"aiding and abetting" to the jury.

**7. Criminal Law § 9— parties — aiding and abetting**
    When two or more persons aid and abet each other in the commission
 of a crime, all being present, all are principals and are equally guilty.

APPEAL from *Braswell, J.,* 7 July 1969 Session DURHAM County
Superior Court.

Defendants were tried together under separate bills of indict-
ment charging them with murder in the first degree of one William
Worsley on 13 April 1969. Each defendant entered a plea of not
guilty.

The State's evidence is summarized as follows: James Jones tes-
tified that he operated a piccolo and liquor house on North Roxboro
Street in Durham. William Worsley came to his house on the night
of 12 April 1969 at about 11:45 p.m. Forty-five minutes later the
defendant John Anderson Holloway (Holloway) entered the house
carrying a shotgun. "[H]e went to point the gun at William (Wor-
sley), and William grabbed the gun and they started tussling and
tussled into the kitchen, . . ." Larry Jones (Larry) then came in
carrying a .22 caliber rifle. "[W]hen Larry came into the door he
fired a shot, and then he went on to the kitchen door, and he fired
two more shots and went on into the kitchen and I didn't see them
any more." The witness heard Larry Jones say "turn loose the door,
turn loose the damn door or I am going to kill you right now." The
witness then heard a single shot and Holloway and Larry walked
out of the kitchen with their weapons. They were accompanied by
Phillip Jones (Phillip) who carried a .22 caliber rifle. It was the first
time the witness had seen Phillip since the other defendants entered
the house. The witness found Worsley lying face down in the
kitchen.

Two other persons who were at James Jones' house during the
early morning hours of 13 April 1969 testified for the State. They
told of seeing Holloway and Larry enter the house with guns and
hearing the shots. One witness saw Phillip enter the house by the
back door. None of the State's witnesses actually saw what went on
in the kitchen.

Expert medical evidence indicated Worsley died of a single .22
caliber bullet wound in the right forehead just below the hairline.
There was no evidence to show from which of the two .22 caliber
rifles the fatal bullet was fired.

Police Officer S. R. Day testified that after having been fully
advised of his rights, Holloway stated that early the night of the
killing, the deceased came by and fired some shots into Holloway's
house. Holloway became concerned about the welfare of one of his

sons so he got them together with guns and they went to the house on North Roxboro Street after the deceased. Holloway was quoted as stating that he had done the officers a favor by shooting the deceased.

Defendants offered evidence in substance as follows: John Holloway is the father of Phillip Jones, age 18, and Larry Jones, age 19. Early on the day of 12 April 1969, the deceased, William Worsley, came to Holloway's house and threatened to shoot Holloway and his two sons. Worsley returned about 3 p.m., stated that he had lost his wallet and if he did not get it back somebody was going to be missing. Worsley left and returned about 11:30 p.m., again threatening to shoot all three defendants if his pocketbook was not returned. On each occasion Worsley was told by Holloway that he had not seen the pocketbook. Shortly after 11:30 p.m. Worsley called to Holloway from outside the front of the house stating: "you had better get ready." Worsley then shot into the front door several times. A few minutes later Worsley called out from the rear of the house saying: "John Holloway, G - - d - - - it, you in there?" Worsley then shot into the house again. Phillip, who was not at the house at the time of the shooting, was thought by Holloway to be at the piccolo house of James Jones about a half block away. Holloway, armed with a shotgun, and Larry Jones, armed with a rifle, went to the piccolo house for the purpose of warning Phillip Jones about Worsley's threats. As they entered the house Worsley stepped from behind the door, grabbed the shotgun, and pulled Holloway into the kitchen where a "tussle" ensued and Holloway was thrown to the floor. Larry fired three shots over their heads and then dropped his rifle and started scuffling with Worsley over the shotgun which Worsley had wrested from Holloway. The shotgun fell to the floor and Larry and Worsley tussled for several minutes on the floor before Worsley got free, picked up the rifle, and pointed it in the direction of Larry and Holloway. At that moment Phillip Jones, who had entered by the back door, fired a single rifle shot and Worsley fell.

Phillip Jones testified that he had been at the piccolo house until approximately midnight. He went from there to Troy's Chicken Box about three blocks away. He stayed there for about five or six minutes and then went to his father's home where he was advised that Worsley had "shot up" the house and made threats against the lives of Holloway and both sons. He was further told that his father and brother had gone to the piccolo house to warn him of the threats. Phillip then got a rifle and ran to the piccolo house. He had heard some shots while at his father's home so he entered the piccolo house

by the back door. When he looked into the kitchen he saw his brother lying on the floor at the side of the room and his father lying on the floor behind his brother. Worsley was getting up aiming the rifle toward them. Phillip raised his gun and fired one time because he was afraid Worsley was going to shoot his brother and father.

Defendants offered the testimony of several witnesses which corroborated their evidence concerning the threats made against their lives by Worsley and tended to show that Worsley had a reputation for violence. One witness identified a spent bullet as having been removed from the door of Holloway's house the morning following the shootings. Janie Thompson testified that she was at Holloway's house when Worsley made the threats and fired inside. She stated that she reported this to Phillip Jones when he returned to the house about five or ten minutes after Holloway and Larry had left and told him that his father and brother had gone to the piccolo house looking for him.

The court submitted to the jury in substance the following possible verdicts: As to John Holloway: (1) guilty of first degree murder, (2) guilty of first degree murder with a recommendation of life imprisonment, (3) guilty of aiding and abetting Phillip Jones in the offense of first degree murder, (4) guilty of aiding and abetting Phillip Jones in the offense of first degree murder with a recommendation of life imprisonment, (5) guilty of second degree murder, (6) guilty of aiding and abetting Phillip Jones in the offense of second degree murder, (7) not guilty. As to Phillip Jones: (1) guilty of first degree murder, (2) guilty of first degree murder with a recommendation of life imprisonment, (3) guilty of aiding and abetting John Holloway in the offense of first degree murder, (4) guilty of aiding and abetting John Holloway in the offense of first degree murder with a recommendation of life imprisonment, (5) guilty of second degree murder, (6) not guilty. As to Larry Jones: (1) guilty of aiding and abetting John Holloway; or either Phillip Jones in the offense of first degree murder, (2) guilty of aiding and abetting John Holloway or either Phillip Jones in the offense of first degree murder with a recommendation of life imprisonment, (3) guilty of aiding and abetting Phillip Jones or John Holloway in the offense of second degree murder, (4) not guilty.

The jury returned verdicts finding Holloway and Phillip Jones "guilty of murder in the second degree" and the defendant Larry Jones "guilty of aiding and abetting Phillip Jones or John Holloway in the offense of murder in the second degree." Judgments were entered on the verdicts imposing active prison sentences and defendants appealed.

*Robert Morgan, Attorney General, by James L. Blackburn, Staff Attorney, for the State.*

*James R. Patton and C. Horton Poe, Jr., for defendant appellants.*

GRAHAM, J.

[1]    Defendants contend that the deceased was killed by Phillip Jones in defense of his father and brother and at a time when such action was necessary or reasonably appeared to Phillip Jones to be necessary in order to protect them from death or great bodily harm. A person may lawfully kill in defense of his family under such circumstances. *State v. Todd,* 264 N.C. 524, 142 S.E. 2d 154; *State v. Marshall,* 208 N.C. 127, 179 S.E. 427. The court properly instructed the jury as to the principles of self defense and the right to kill in defense of one's family but did not instruct the jury that they could return a verdict of guilty of voluntary manslaughter. Defendants assign the omission of this instruction as error.

[2]    Where there is evidence that would support a lesser degree of the crime charged in the bill of indictment, a defendant is entitled to have the question of his guilt of the lesser crime submitted to the jury. G.S. 15-170. If the court fails to do so, the error is not cured by a verdict of guilty of a higher offense. *State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461; *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652; *State v. McNeill,* 229 N.C. 377, 49 S.E. 2d 733; *State v. Lee,* 206 N.C. 472, 174 S.E. 288; *State v. Williams,* 185 N.C. 685, 116 S.E. 736; *State v. Merrick,* 171 N.C. 788, 88 S.E. 501.

[3-5]    In our opinion the issue of defendants' guilt of voluntary manslaughter arises on the evidence and should have been submitted to the jury. If Phillip Jones shot the deceased intentionally, he would be guilty of murder in the second degree at least unless he could rebut the presumption of malice arising from an intentional shooting and thereby reduce the offense to voluntary manslaughter. He could do this by proving to the jury's satisfaction that he killed the deceased in the heat of passion, or that while exercising his right to defend his family from death or great bodily harm, he used no more force than was or reasonably appeared to him to be necessary. *State v. Moore, supra; State v. Ramey,* 273 N.C. 325, 160 S.E. 2d 56. There is no evidence that deceased was killed in the heat of passion. However, evidence that Phillip Jones was acting in defense of his father and brother necessarily raises the issue of manslaughter because the jury could find that though Phillip was defending members of his family, he used more force than necessary or than rea-

sonably appeared to him necessary to protect and defend them from death or great bodily harm. "Where the evidence is susceptible to the interpretation . . . that defendant killed in self defense, . . . the court must submit the question of defendant's guilt of manslaughter." 4 Strong, N.C. Index 2d, Homicide, § 30, p. 257.

[6, 7]    Defendants also contend that the verdicts rendered, when considered with the charge, were inconsistent and should have been set aside. Since a new trial will be required for all defendants it is unnecessary that we rule on this assignment of error or discuss it in detail. However, we note that technically speaking there is no such offense in this State as "aiding and abetting in the offense of murder." When two or more persons aid and abet each other in the commission of a crime, all being present, all are principals, and equally guilty. *State v. Peeden,* 253 N.C. 562, 117 S.E. 2d 398; *State v. Spencer,* 239 N.C. 604, 80 S.E. 2d 670. It was therefore unnecessary for the trial judge to submit to the jury separate possible verdicts of "aiding and abetting" as to any of the defendants and the effect of doing so was to submit two possible verdicts of the same degree of crime.

We do not discuss the defendants' other assignments of error as there must be a new trial, and they are not likely to re-occur.

New trial in all cases.

CAMPBELL and PARKER, JJ., concur.