### STATE v. MARSHALL "CAM" POPLIN.

(Filed 2 December, 1953.)

**Homicide § 27f—Evidence held to require instruction on defendant's right to defend himself in his home and eject trespassers.**

> The evidence favorable to defendant disclosed that defendant occupied a bedroom in a certain house, that defendant, deceased and others, got into an altercation in the kitchen of the house, and that defendant went to his bedroom and got his pistol and shot his assailant who continued to approach him with an upraised chair notwithstanding that defendant had ordered him from the house and told him not to come into the room. *Held:* It was incumbent upon the trial court, even in the absence of prayer for special instructions, to define a home within the meaning of the law of self-defense and to charge upon defendant's legal right to defend himself in his home, to defend his home from attack and to eject trespassers therefrom, as substantive features of the case arising upon the evidence. G.S. 1-180.

APPEAL by defendant from *Whitmire, Special Judge,* at Extra 10 August, 1953, Criminal Term of MECKLENBURG.

Criminal prosecution upon a bill of indictment charging defendant with the murder of one Wade D. Philemon.

Plea of defendant was not guilty.

The Solicitor for the State announced in open court that the State would not seek the capital verdict but would seek a conviction of second degree murder or manslaughter as the evidence would warrant.

Upon the trial in Superior Court the State offered evidence tending to show that about 11 o'clock on the night of 11 July, 1953, Wade Philemon came to his death as the result of pistol shot received while he was in the

house where defendant Poplin was; that in this house there was a hallway leading from the front to the rear; that there were two bedrooms up front, and another room and kitchen and bath in the back; that one of these bedrooms was the bedroom of defendant,—he lived there; that one Douglas Haygood McDonald (a witness for the State), and Wade Philemon went to this house, entered the front door without speaking to anyone, and walked through the hall to the kitchen; that one George H. Bowles was back there, and defendant came in with them; that McDonald and Philemon asked Bowles for a pint of whiskey, and defendant went and got it,—McDonald asking "How much?", defendant replying "Four dollars"; that McDonald asked if three dollars and fifty cents would do, and defendant said "No." Whereupon McDonald handed him four dollars; that Bowles came over at McDonald with a roofing knife, and McDonald hit him in the mouth; that then Bowles started at Philemon and took him into the other room; that defendant had a pistol on McDonald and told him to get out, and he, McDonald, said "OK, Cam," and started out, and got to the front door and heard the shot,—and Philemon said "He got me,"—he grabbed his side; that when defendant drew the pistol on McDonald he was standing in his bedroom, up front from the kitchen, and McDonald was in the hall at the kitchen about six feet away, and Philemon was back in the other room; that it was necessary to go by the bedroom door where defendant was standing to get out of the kitchen and out of the house; that McDonald did not see the shooting, and does not know what Philemon was doing; but that there was a broken chair in the hall, when the sheriff came. McDonald testified that "As far as I know no one was mad about an argument over the whiskey. Mr. Poplin did not tell me to get out of the house because I was raising a disturbance. The fight started before we could get out of the house. Bowles came at me with a knife . . . he had said nothing to me . . ." The State rested.

Thereupon defendant, reserving exception to the denial of his motion for judgment as of nonsuit, offered the testimony of George H. Bowles, and also testified in his own behalf. Their testimony tended to show that defendant and Bowles each rented a bedroom in the house where the shooting took place,—defendant the one on the left as one enters the house, and Bowles the one on the right; that they both were sitting on the front porch when Philemon and McDonald came to the house, walked in, and went back to the kitchen; that defendant got up and walked in behind them, and Bowles followed; and that in the kitchen, there was a whiskey transaction; that Philemon and McDonald were drinking "pretty heavily"; that they started the disturbance; that as Philemon came up with a chair he knocked out a light over his head; that defendant went toward his bedroom—Philemon chasing him up the hall—with the chair; and that the shot was fired by defendant as he stood in his bedroom.

Bowles testified, in part: "I went into the kitchen and then into the bathroom. When I came out . . . McDonald and Bud (Philemon) were talking. I heard Bud tell McDonald: 'I'm a s.o.b. if I don't do it.' McDonald turned to me and said: 'I'll get this big fat s.o.b.' About this time Bud picked up the chair. Cam (defendant) said, 'Let's go.' He . . . ran out into the hall that leads up to his room to the front. When Bud came up with the chair he knocked out a light over his head. Mc-Donald ran into me and hit at me. I came up with my flashlight and McDonald jumped back and said 'Wait until I get my knife.' I heard Cam say 'Get out! get out!' About that time the gun fired . . . I heard Poplin tell the two men to get out three times . . . Poplin was standing inside his room when the shooting took place. The chair that deceased had and used was right in front of Cam's door. A leg was broken as was a piece of the plank bottom. I never assaulted McDonald. I never spoke to him. I'd never seen him before: The only conversation I heard was that Bud said: 'I'm a s.o.b. if I don't get him,' and McDonald saying, 'I'll get this fat one.' At this time Poplin didn't have his pistol. He kept it in his bedroom. I saw Mr. Poplin go into the hall and into his bedroom. The deceased chased Poplin up the hall. He ran right up behind him with the chair . . . When the gun fired McDonald and I were in the kitchen."

And defendant testified, in pertinent part: "I am around 66 years of age . . . I didn't know McDonald or Philemon, but I had seen them a couple of times before that . . . I tried to deny I had any whiskey. They were getting louder . . . I got a pint and told McDonald to pick up his money. He took the pint of whiskey. Philemon hadn't spoken up to this time. Philemon said: 'I'm going to kill that damned old man. He wouldn't cash a check for me.' I told Philemon I had never done anything to him. I asked McDonald to go out on the porch with me. I stepped into the hall. I heard that awful lick and it knocked out that light in the kitchen. It was dark. I made it to my room. I was hollering every step, 'Come on out of there, the police are coming, come on out of there' . . . By the time I got to my door I saw Philemon coming down the hall with a chair in his hand. He got right at the door. I saw the chair up here about my head. I saw the chair hit the door. My bed was just inside the door of my room in the corner. I didn't have my pistol at this time. It was under the pillow. I only had to push the door a little bit back and reach and get it. I hollered, 'Don't you come into this room, don't you come into this room.' He was standing directly in front of my door. He got the chair up. I told him not to pick the chair up: I showed him the gun. I stepped back middleways of the door. He could have hit me. He got the chair up. I waited and wished he wouldn't do it, but he came, le'nt that way and when he did, I shot at his arm. I

was trying to stop him. I was afraid of him. I shot because he was coming on me with a chair. I was asking him to stop . . . He dropped the chair, kicked it out of the way, grabbed his arm and went out of the door . . . I wasn't drinking . . . I wasn't mad at Philemon. He and two fellows came to the house a week or so before this and wanted me to cash a twenty-five dollar check. I told them I didn't have the money . . ."

Then defendant rested, and the State put up as a witness a police officer, who testified, in part: That Wade Philemon was shot in the left shoulder, about three inches below the shoulder; that apparently the bullet had gone straight in; that he questioned Poplin at the station; and he was apparently sober, and that Poplin said that the deceased approached him with an upraised chair,—that he was standing in his room at the time he shot,—that he had repeatedly asked Philemon and McDonald to leave his home.

The State then rested, and defendant renewed his motion for judgment as of nonsuit. The motion was denied and defendant excepted.

Verdict: Guilty of manslaughter.

Judgment: Confinement in the State's Prison for not less than fifteen (15) years nor more than eighteen (18) years to perform such labor as he is able to do in the discretion of the prison authorities.

Defendant appeals therefrom to Supreme Court and assigns error.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*Ray S. Farris and James B. Ledford for defendant, appellant.*

WINBORNE, J. While defendant, appellant, brings forward and presents in his brief several exceptions to the charge as given by the trial court to the jury, particularly in respect to the burden of proof, some of which may have merit, the assignments of error chiefly relied upon, and rightly so, are based upon exceptions to the failure of the trial court to declare and explain the law arising upon the evidence in the case as it relates to defendant's legal right to defend himself in his home, and to defend his home from attack, and to evict trespassers therefrom. See *S. v. Spruill,* 225 N.C. 356, 34 S.E. 2d 142, and cases there cited; also *S. v. Goodson,* 235 N.C. 177, 69 S.E. 2d 242, and cases cited.

And the conduct of defendant is to be judged in the light of these rights. Hence what is a home, in the light of the evidence in the case, is a salient element of the right.

These are substantive features of the case, as to which defendant is entitled to have the trial court declare and explain the law arising thereon, G.S. 1-180, as amended by 1949 Session Laws, Chap. 107, even in the

absence of special prayer for instruction in respect thereto. *S. v. Spruill, supra,* and cases cited.

Other assignments of error need not be considered, as the matters to which they relate may not recur on another trial.

For error pointed out, let there be a

New trial.