STATE OF NORTH CAROLINA v. BRADLEY EUGENE MORGAN

No. 711A84

(Filed 18 February 1986)

1. **Criminal Law § 85.3— cross-examination of defendant—evidence of assaultive conduct to show character for truthfulness—impropriety**

   The prosecutor's cross-examination of defendant concerning an alleged specific incident of misconduct, i.e., two assaults by pointing a gun at two people during the same incident, was improper under N.C.G.S. 8C-1, Rule 608(b) because extrinsic instances of assaultive behavior, standing alone, are not in any way probative of the witness's character for truthfulness or untruthfulness.

2. **Criminal Law § 85.3— homicide—defendant as aggressor—evidence of misconduct to show character for violence—admission improper but not prejudicial**

   The trial court in a first degree murder case erred in allowing the prosecutor to cross-examine defendant regarding extrinsic acts of misconduct in

State v. Morgan

order to circumstantially prove defendant's character for violence as the basis for an inference that defendant was the aggressor in the affray which resulted in the homicide in question and could not have acted in self-defense, since N.C.G.S. 8C-1, Rule 404(b) specifically provides that such evidence is not admissible to show that, because defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial; however, the error in admitting the evidence was not prejudicial where there was no reasonable possibility that a different result would have been reached at trial had the error in question not been committed.

**3. Criminal Law § 85— extrinsic conduct evidence—procedure for introducing**

Both N.C.G.S. 8C-1, Rule 404(b) and Rule 608(b) require the trial judge, prior to admitting extrinsic conduct evidence, to engage in a balancing, under Rule 403, of the probative value of the evidence against its prejudicial effect, and the better practice is for the proponent of the evidence, out of the presence of the jury, to inform the court of the rule under which he is proceeding and to obtain a ruling on its admissibility prior to offering it.

**4. Criminal Law § 73— objection to evidence as hearsay—similar evidence admitted without objection**

There was no merit to defendant's contention that testimony by a doctor concerning decedent's statement to the effect that he had removed money from his bank account in order to enter into a partnership amounted to inadmissible hearsay upon hearsay and was highly prejudicial to him as a link in the State's theory that defendant's motive for killing the victim was to remove him from the partnership and thereby to obtain financial gain, since there was other evidence, not objected to by defendant, as to the business relationship between defendant and deceased, and the testimony merely corroborated defendant's own testimony that he and deceased entered into a joint business venture.

**5. Homicide § 28.3— self-defense—right of defendant to stand ground—failure to instruct error—no prejudice**

Although it was error for the trial court not to instruct the jury as to defendant's right to stand his ground if it believed his testimony and found that he was not the aggressor, this error was not properly preserved for review where defendant failed to make timely objection at trial as required by Rule 10(b)(2), Rules of App. Procedure, and such error did not constitute "plain error" requiring reversal of defendant's conviction where it did not appear that, absent the error, the jury probably would have reached a different verdict.

Justice EXUM dissenting.

BEFORE Owens, J., at the 15 October 1984 Criminal Session of Superior Court, RUTHERFORD County, defendant was convicted of first-degree murder. Defendant appeals his sentence of life imprisonment as a matter of right, pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 21 November 1985.

*Lacy H. Thornburg, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Louis D. Bilionis, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant brings forth three assignments of error. First, defendant contends that the trial court committed reversible error in allowing the prosecutor, over objection, to cross-examine the defendant concerning a specific instance of prior assaultive conduct that was not probative of truthfulness or veracity. Second, defendant contends that it was reversible error for the trial court to admit testimony concerning a hearsay statement by the decedent recorded in his hospital file that was not itself admissible under any exception to the hearsay rule. Third, defendant contends that the trial court committed "plain error" by failing to instruct the jury that with regard to his theory of self-defense, the defendant had a right to stand his ground and had no duty to retreat. For the reasons stated below, we find no reversible error.

The State's evidence tended to show that in the fall of 1983, defendant and the deceased, Austin Yates Harrell, entered into a partnership agreement for the operation of a produce business and "flea market" in Alexander, North Carolina. The business became known as "Geno's" and was operated in a building fronting on Highway 221-A. Defendant also lived in the building.

During the early evening hours of 4 July 1984, Harrell went into the Amoco station across the intersection from Geno's and told Betty Jo Grayhouse that he was "going to close the place [Geno's] down." That same evening, defendant walked over to the Amoco station and told Ms. Grayhouse that Mr. Harrell was going to close him down and that she would see his (defendant's) name in the headlines before midnight. After defendant left the Amoco station, Ms. Grayhouse heard a "bang." A few minutes later, she saw the defendant come over to the Amoco station and go into a telephone booth.

Mrs. Debra Tate and her family were sitting on their front porch on the evening of 4 July 1984. The Tate residence is just across the road from Geno's. At about 7:45 p.m., Mrs. Tate no-

ticed Mr. Harrell out in front of Geno's fixing a bicycle. After he finished working on the bicycle, Mr. Harrell moved a metal table to a spot about four feet from the front door of Geno's and set up a folding metal chair near the table. As Mr. Harrell was bending down, about to sit down in the chair, defendant "threw open" the front door, aimed a shotgun at Mr. Harrell, and shot him. Mr. Harrell fell over backwards. Defendant reached back inside the door, put the shotgun away, and called across the street to Mr. Tate, saying, "Come here, you seen what I did." When Mr. Tate refused to go across the street, defendant walked over to the Amoco station. Law enforcement officers arrived shortly thereafter and arrested the defendant. Sonny Chapman of the Rutherford County Sheriff's Department saw Mr. Harrell's body on the ground outside Geno's with his feet some three to four feet from the front door.

An investigation of the scene produced a shotgun containing a spent cartridge leaning against a refrigerator inside the front door of the building. A hatchet was discovered underneath the sofa two to three feet from the wall, and a knife was found on a shelf next to the back door. What appeared to be bits of flesh were observed outside the building on a wooden brace nine feet from the edge of the front door, on the curb line, and on the center line of the highway in front of the building.

Dr. Michael Wheeler performed a post-mortem examination of decedent's body and testified at trial that the fatal wound was caused by a shotgun slug which entered the left side of Mr. Harrell's neck and exited the right side. The doctor estimated that the shot was fired from one and one-half to two and one-half feet away. Dr. Wheeler noted that the decedent was 6'-3" tall and weighed approximately 280 pounds. In his opinion, a person of decedent's size, if shot in the manner in which the State contends decedent was shot, would fall backwards from where he was standing; the force of the shotgun blast would cause the victim's torso to be forced back somewhat, but his feet would probably not have moved. Dr. Wheeler also testified that his analysis of a sample of the decedent's blood indicated that he was intoxicated at the time of his death: "The blood ethynol level was 160 millimeters percent."

The defendant, who is 5'-7" tall and weighs approximately 155 pounds, testified on his own behalf and offered a very different account of the events leading up to Mr. Harrell's death. He testified that he and Mr. Harrell dissolved their partnership on 2 February 1984, when he paid Harrell $1,000 in cash for Harrell's interest in the business. He did not see Mr. Harrell again until 29 June 1984 when Harrell came by Geno's looking for a place to stay. Others who knew Mr. Harrell testified that he had not been in the area for some time. Defendant also testified that he allowed Mr. Harrell to stay with him at Geno's on the condition that he remain sober. Mr. Harrell did not comply with that condition, however, and drank continuously from the time he arrived on Sunday, rarely sleeping and sometimes acting belligerently. Finally, defendant asked Mr. Harrell to leave, and defendant left for Chesnee, South Carolina, hoping that Mr. Harrell would be gone when he returned.

However, after arriving in Chesnee, defendant testified that he ran into Mr. Harrell who caught a ride back to Alexander with him. The two argued on the way back about whether Mr. Harrell would continue to stay with the defendant. The argument continued after they arrived at Geno's and, according to the defendant, Mr. Harrell went into a rage and threw a hatchet through the front door at him. The hatchet came to rest underneath the sofa. Harrell then pursued the defendant to the back of the building with a butcher knife and when he exited the back door, defendant tried to lock him out. However, Mr. Harrell came around to the front door again and threw a school desk/chair at the defendant, but it landed instead on the store's canopy. When Harrell came at the defendant through the front door, defendant reached for Harrell's shotgun and told him, "Yates, don't come in here no more; I can't take it anymore." According to defendant, Mr. Harrell responded, "This is it . . . I'm going to kill you." At that point, defendant fired the shotgun as Harrell came through the front door at him.

The defendant offered both lay and expert testimony to the effect that Mr. Harrell suffered from manic depressive psychiatric disorder and was taking prescription medications for treatment of that disorder. Defendant tendered the testimony of witnesses who had observed the decedent prior to the shooting behaving in odd and occasionally violent ways. Dr. William Westmoreland

testified that he had treated Harrell at the Spindale Mental Health Center during 1983 and 1984. He described Harrell's mood swings as characteristic of persons suffering from manic depressive psychiatric disorder and discussed the effect of alcohol consumption during the various stages of the disorder. During Dr. Westmoreland's last visit with Harrell on 28 June 1984, Harrell's condition was described as "stable . . . coming from a depressed state."

Defendant's theory of the case was that he had shot Harrell in self-defense, that he reasonably felt it necessary to shoot Harrell in order to protect himself from Mr. Harrell, a 6'-3", 280-pound manic depressive who was coming at him through the doorway of his home and business threatening to kill him. Defendant admitted on cross-examination, however, that at the time he shot Harrell, Harrell did not have a weapon in his hand.

I.

During recross-examination of the defendant at trial, the following exchange took place:

Q. Mr. Morgan, do you recall that on April 26th, 1984, less than three months before this incident, that you assaulted Mike Hall with a deadly weapon, a shotgun, by pointing it at Mr. Hall and stating that you would cut him in two with the shotgun there at this same place of business, did you not do that did you not do that [sic] with Mike Hall?

MR. MITCHELL: Objection.

THE COURT: Objection Overruled.

A. Mike Hall followed me from the station and come into my sotre [sic], yes sir, I remember that.

Q. And then when Roger Poteat, the CHief [sic] of Police of Alexander Mills, came to serve the Warrant, did you not point the shotgun at Roger Poteat?

A. No sir, I did not. I showed Roger the gun and it wouldn't [sic] even loaded.

The trial judge thus allowed the prosecutor to question defendant on cross-examination about a prior act of assaultive conduct not charged in the indictment upon which he was being

tried. Also referred to as "uncharged misconduct evidence," "prior bad acts," or "extrinsic conduct evidence," introduction of this type of evidence has the potential of raising problems under two sections of the Evidence Code, N.C.G.S. § 8C-1, Rules 404(b) and 608(b) (Cum. Supp. 1985). Before analyzing the propriety of the trial judge's ruling here, we must be clear about what the transcript reveals.

This colloquy took place on recross-examination of the defendant by the prosecutor. The defendant had just testified on his own behalf and had admitted shooting Mr. Harrell but claimed he had done so in self-defense. Defendant testified that he would not have shot Mr. Harrell if he had not been afraid of him. During direct and redirect examination, defendant had testified as to Mr. Harrell's often violent behavior and his drinking during the days preceding his death. Apparently without having requested a ruling on admissibility prior to trial, the prosecutor on recross-examination then inquired of defendant whether he had engaged in a specific act of misconduct, which involved the same type of conduct (use of a shotgun at defendant's place of business) as that resulting in the charges for which defendant was being tried, but directed toward unrelated third parties at a time three months prior to the Harrell incident. Defendant admitted pointing the shotgun at Mike Hall but denied pointing the shotgun at Police Chief Poteat. The prosecutor did not then seek to further prove this conduct by extrinsic evidence; thus the record does not reveal the specific circumstances surrounding the 26 April 1984 incident. In the record before us, there is no indication why defendant pointed a gun at Mr. Hall, whether Chief Poteat ever served the warrant or even what or for whom the warrant was issued, or whether defendant was ever charged and convicted of pointing a gun at either man. For purposes of this discussion, we shall assume that defendant was not convicted of either alleged previous assault. Thus, this exchange informed the jury that defendant, at his place of business, may have pointed a shotgun at two men other than Mr. Harrell within three months of the 4 July tragedy when similar conduct resulted in Mr. Harrell's death and defendant's arrest therefor.

The trial judge's ruling allowing this information to be heard by the jury raises important evidentiary questions to be answered in accordance with the North Carolina Evidence Code.

The briefs on appeal of this matter argue for and against admissibility of evidence of defendant's character traits through questions regarding his alleged prior act of misconduct pursuant to two sections of the Evidence Code. Defendant argues that the prosecutor's questions were improper under N.C.G.S. § 8C-1, Rule 608(b) (evidence of specific instances of conduct for the purpose of proving credibility of witness or lack thereof). The State contends that the evidence was properly admitted pursuant to Rule 404(b) (evidence of specific instances of a party's conduct for the purpose of proving motive, opportunity, etc.) as well as Rule 608(b).

Although both rules concern the use of specific instances of a person's conduct, the two rules have very different purposes and are intended to govern entirely different uses of extrinsic conduct evidence.[1] *See* Commentary, N.C.G.S. § 8C-1, Rule 608(b) ("Evidence of wrongful acts admissible under Rule 404(b) is not within this rule. . . ."). Our task on appellate review is complicated by the fact that there is nothing in the record indicating under which rule the prosecutor was proceeding or under which rule the trial judge overruled the objection. We must therefore consider the admissibility of the evidence under both Rule 404(b) and Rule 608(b).

### A.

[1] Defendant correctly argues that the evidence of his alleged prior act of misconduct was inadmissible pursuant to Rule 608(b) (evidence of specific instances of conduct for the purpose of proving credibility of a witness or lack thereof). That rule provides:

(b) *Specific instances of conduct.—*Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the

---

1. "Extrinsic conduct evidence" refers to evidence of a specific prior or subsequent act, not charged in the indictment, which may be criminal but, as applied in Rule 608(b), does not result in a conviction. Criminal convictions are included in Rule 404(b).

character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

N.C.G.S. § 8C-1, Rule 608(b) (Cum. Supp. 1985).

Rule 608(b) represents a drastic departure from the former traditional North Carolina practice which allowed a defendant to be cross-examined for impeachment purposes regarding *any* prior act of misconduct not resulting in conviction so long as the prosecutor had a good-faith basis for the questions. *E.g., State v. Dixon*, 77 N.C. App. 27, 334 S.E. 2d 433 (1985).

Rule 608(b) addresses the admissibility of specific instances of conduct (as opposed to opinion or reputation evidence) only in the very narrow instance where (1) the *purpose* of producing the evidence is to impeach or enhance credibility by proving that the witness' conduct indicates his character for truthfulness or untruthfulness; and (2) the conduct in question *is in fact probative* of truthfulness or untruthfulness and is not too remote in time; and (3) the conduct in question did *not result in a conviction*; and (4) the inquiry into the conduct *takes place during cross-examination*. If the proffered evidence meets these four enumerated prerequisites, before admitting the evidence the trial judge must determine, in his discretion, pursuant to Rule 403, that the probative value of the evidence is not outweighed by the risk of unfair prejudice, confusion of issues, or misleading the jury, and that the questioning will not harass or unduly embarrass the witness. Even if the trial judge allows the inquiry on cross-examination, extrinsic evidence of the conduct is not admissible. N.C.G.S. § 8C-1, Rule 608(b) and Commentary.

Because the only purpose for which this evidence is sought to be admitted is to impeach or to bolster the credibility of a witness, the only character trait relevant to the issue of credibility is veracity or the lack of it. The focus, then, is upon whether the conduct sought to be inquired into is of the type which is indicative of the actor's character for truthfulness or un-

truthfulness. Among the types of conduct most widely accepted as falling into this category are "use of false identity, making false statements on affidavits, applications or government forms (including tax returns), giving false testimony, attempting to corrupt or cheat others, and attempting to deceive or defraud others." 3 D. Louisell & C. Mueller, Federal Evidence § 305 (1979) (footnotes omitted). On the other hand, evidence routinely disapproved as irrelevant to the question of a witness' general veracity (credibility) includes specific instances of conduct relating to "sexual relationships or proclivities, the bearing of illigitimate [sic] children, the use of drugs or alcohol, . . . *or violence against other persons.*" *Id.* (footnotes omitted) (emphasis added). *See also* 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶608[05] (1985) ("crimes primarily of force or intimidation . . . or crimes based on malum prohibitum are not included"). For example, in *United States v. Alberti*, 470 F. 2d 878 (2d Cir. 1972), *cert. denied*, 411 U.S. 919, 36 L.Ed. 2d 311 (1973), cross-examination of a witness regarding a prior assault was properly disallowed because "the conduct involved does not relate to truthfulness or untruthfulness." *Id.* at 882. *See also United States v. Hill*, 550 F. Supp. 983 (E.D. Pa. 1982), *aff'd*, 716 F. 2d 893 (3d Cir. 1983), *cert. denied*, 464 U.S. 1039, 79 L.Ed. 2d 165 (1984) ("acts of assault, force, or intimidation do not directly indicate an impairment of a witness' character for veracity." *Id.* at 990); *United States v. Kelley*, 545 F. 2d 619 (8th Cir. 1976), *cert. denied*, 430 U.S. 933, 51 L.Ed. 2d 777 (1977) (evidence tending to show defendant had directed threats and violence toward these victims in the past properly excluded under Rules 607, 608, 609; court intimates that had defendant asserted self-defense at trial, the evidence might have been admissible under Rule 404(b) ).

We conclude that the prosecutor's cross-examination of defendant in this case concerning an alleged specific instance of misconduct, i.e., two assaults by pointing a gun at two people during the same incident, was improper under Rule 608(b) because extrinsic instances of assaultive behavior, standing alone, are not in any way probative of the witness' character for truthfulness or untruthfulness.

## B.

[2]  Our inquiry does not end here, however, because the State contends that the prosecutor's cross-examination was proper un-

der Rule 404(b) (evidence of specific instances of conduct for the purpose of proving character of accused to show motive, opportunity, etc.), which provides:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (Cum. Supp. 1985).

The question of admissibility of the "extrinsic conduct" of a criminal defendant pursuant to Rule 404(b) is the most litigated area of evidence. 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶404[08], at 404-47 (1985); Roth, *Understanding Admissibility of Prior Bad Acts: A Diagrammatic Approach*, 9 Pepperdine L. Rev. 297, 297 (1982). The heart of the long-established rule, codified in Rule 404(b), is restated by Professor McCormick as follows:

> [T]he prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is introduced for some purpose other than to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial.

McCormick on Evidence § 190, at 557-58 (3d ed. 1984) (footnotes omitted). *See also* E. J. Imwinkelried, Uncharged Misconduct Evidence § 1:03 (1984); *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954) (traditional North Carolina rule).

In determining the admissibility of extrinsic conduct evidence pursuant to Rule 404(b), the trial judge must first determine the preliminary issue of whether the conduct is being offered pursuant to that rule. As the instant case illustrates, it is not always clear whether such evidence is being offered under 404(b) or under 608(b). Rule 404(b) has been interpreted as applicable only to parties and, in a criminal case, would usually be applicable only to a defendant. Rule 608(b) governs reference to specific instances of conduct only on cross-examination regarding the credibility of any witness and prohibits proof by extrinsic evi-

dence. Under Rule 404(b), however, evidence regarding extrinsic acts is not limited to cross-examination and *may* be proved by extrinsic evidence as well as through cross-examination. Commentary, N.C.G.S. § 8C-1, Rule 608. If the trial judge makes the initial determination that the evidence is of the *type* and offered for the proper *purpose* under Rule 404(b), the record should so reflect.

The next step in determining admissibility of the extrinsic conduct evidence under Rule 404(b) is a determination of its relevancy. As stated earlier, Rule 404(b) allows the use of extrinsic conduct evidence so long as the evidence is relevant for some purpose *other than* to show that defendant has the propensity for the type of conduct for which he is being tried.

Any evidence must be logically relevant in order to be admissible. N.C.G.S. § 8C-1, Rule 401 provides:

Rule 401. *Definition of "relevant evidence."*

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

The list in the second sentence of Rule 404(b) contains examples[2] of theories of relevancy under which extrinsic conduct evidence may properly be used as circumstantial proof of a controverted fact at trial (for instance, to prove motive, opportunity, intent, preparation, plan, knowledge, identity, etc.).

The State here contends that the evidence brought out during defendant's cross-examination was admissible under Rule 404(b) because it was relevant to the issue of whether defendant was the aggressor in the altercation he described during direct examination. Since defendant claimed he shot Mr. Harrell in self-defense and since the aggressor in an affray cannot claim the benefit of self-defense unless he has abandoned the fight and has

---

2. The list is neither exclusive nor exhaustive. McCormick on Evidence § 190, at 558 (3d ed. 1984); 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶404[08], at 404-57 (1985). We note that, while Rule 608(b) is quite different from our former rule, Rule 404(b) is much the same as the traditional North Carolina rule and its "exceptions" as set out in *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954). *See also State v. Weldon*, 314 N.C. 401, 333 S.E. 2d 701 (1985); *State v. Dixon*, 77 N.C. App. 27, 334 S.E. 2d 433 (1985) (applying traditional, pre-Code law).

withdrawn by giving notice to his adversary, *State v. Johnson*, 278 N.C. 252, 258, 179 S.E. 2d 429, 433 (1971), whether the defendant was the aggressor was a contested element of defendant's self-defense claim. The State asserts that "[t]his evidence, therefore, was relevant to show that defendant's pointing of the shotgun at the decedent and shooting him was not in self-defense." The State's rationale here is precisely what is prohibited by Rule 404(b). In order to reach its conclusion, the State is arguing that, because defendant pointed a shotgun at Mr. Hill three months earlier, he has a propensity for violence and therefore he must have been the aggressor in the alleged altercation with Mr. Harrell and, thus, could not have been acting in self-defense. Indeed, the Commentary to N.C.G.S. § 8C-1, Rule 404(b) infers that "evidence of a violent disposition to prove that the person was the aggressor in an affray" is an impermissible use of "evidence of other crimes, wrongs, or acts." The theory of relevancy articulated by the State on this appeal is plainly prohibited by the express terms of Rule 404(b) disallowing "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show that he acted in conformity therewith."

The cases relied upon by the State are inapposite. For example, in *United States v. Phillips*, 515 F. Supp. 758 (E.D. Ky. 1981), defendant was charged with shooting a federal marshal. Her defense was that her husband had hypnotized her and that she was legally insane, therefore unable to form the requisite criminal intent. The district court held that evidence that defendant had shot at another government official during an unrelated incident was admissible under Federal Rule of Evidence 404(b) to prove that defendant was able to form such a criminal intent without the direct influence of her husband. We note also that, in admitting the extrinsic conduct evidence, the trial court gave an appropriate instruction, limiting the jury's consideration of this evidence solely to the issue of defendant's state of mind or intent.

In *Atkinson v. State*, 611 P. 2d 528 (Alaska 1980), the court upheld the admission, pursuant to Rule 404(b), of evidence that defendant had previously pointed a gun at and threatened two other trespassers. At trial, defendant claimed that he would never point a gun and that the shooting for which he was on trial was accidental or inadvertent. The extrinsic conduct evidence was

admitted as tending to show that his pointing of the shotgun at the victim was neither inadvertent nor accidental.

In the instant case, defendant claimed neither that his shooting Mr. Harrell was accidental or inadvertent nor that he was unable to form the requisite criminal intent to shoot Mr. Harrell. He claimed that he shot Harrell in self-defense. The proper inquiry in a self-defense claim focuses on the reasonableness of defendant's belief as to the apparent necessity for, and reasonableness of, the force used to repel an attack upon his person. *See State v. Gladden*, 279 N.C. 566, 184 S.E. 2d 249 (1971). The fact that defendant may have pointed a gun at another person sometime in the past, without more, has no tendency to show that the defendant did not fear Mr. Harrell or to make the existence of his belief as to the apparent necessity to defend himself from an attack "more or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401. *Cf. Johns v. United States*, 434 A. 2d 463, 470 n.11 (D.C. App. 1981) ("It would be too attenuated an argument to say evidence of a defendant's reputation for violence indicates a tendency not to fear another person."); *People v. Zatzke*, 33 Cal. 2d 480, 492, 202 P. 2d 1009, 1016 (1949) (Carter, J., dissenting) ("to infer that because [defendant] had been guilty of different acts of sex perversion with others in the past, that he must not be adverse to all acts of sex perversion with anyone is not a logical deduction, a generality with no effect other than to prejudice the defendant in the eyes of the jury"). Had the State's evidence been to the effect that defendant had pointed a gun at or threatened *Mr. Harrell* three months earlier, such evidence would more likely be relevant as tending to show a plan or design, or as negating defendant's claim that Mr. Harrell's attack on him was unprovoked. *See United States v. Kelley*, 545 F. 2d 619 (8th Cir. 1976), *cert. denied*, 430 U.S. 933, 51 L.Ed. 2d 777 (1977).

[3]  It was error for the trial court to allow, over defendant's objection, the prosecutor's cross-examination of defendant regarding alleged extrinsic acts of misconduct in order to circumstantially prove defendant's character for violence as the basis for an inference that defendant was the aggressor in the affray and could not have acted in self-defense. We note, in addition, that there is nothing in the record to indicate that the trial judge had an opportunity, out of the presence of the jury, to rule on the propriety

of the prosecutor's questions pursuant to either Rule 608(b) or Rule 404(b). Both rules require the trial judge, prior to admitting extrinsic conduct evidence, to engage in a balancing, under Rule 403, of the probative value of the evidence against its prejudicial effect. The better practice is for the proponent of the evidence, out of the presence of the jury, to inform the court of the rule under which he is proceeding and to obtain a ruling on its admissibility prior to offering it. We note, too, that no cautionary instruction was requested or given upon the trial judge's overruling defendant's objection to the admission of this evidence. *See, e.g., United States v. Teague*, 737 F. 2d 378, 381 (4th Cir. 1984), *cert. denied*, --- U.S. ---, 83 L.Ed. 2d 926 (1985); *State v. Robtoy*, 98 Wash. 2d 30, 653 P. 2d 284 (1982); 2 D. Louisell & C. Mueller, *Federal Evidence* § 140, at 193 (rev. ed. 1985). The jury, therefore, was permitted to consider this improperly admitted extrinsic conduct evidence for impermissible purposes.

Although we find that it was error to admit the extrinsic conduct evidence pursuant to Rule 404(b) *on the theory presented by the State on this appeal*, we hold that there is no "reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." N.C.G.S. § 15A-1443(a) (1983). *See also State v. Turner*, 268 N.C. 225, 150 S.E. 2d 406 (1966). The error was, therefore, harmless in light of the other evidence properly admitted at trial. *See, e.g., United States v. Cauley*, 697 F. 2d 486 (2d Cir.), *cert. denied*, 459 U.S. 1222, 75 L.Ed. 2d 464 (1983).

The State presented eyewitness testimony tending to negate defendant's self-defense claim, as well as extensive physical evidence regarding the path of the fatal shotgun slug and the position of decedent's body. We also note that the objected-to exchange, although improper, was quite brief, and the prosecutor did not belabor his point.

II.

[4] In defendant's next assignment of error, he contends that the trial court erred in admitting the testimony of Dr. William Westmoreland concerning a statement made by the decedent, Mr. Harrell, and recorded in his hospital file. Dr. Westmoreland was permitted to read from a note prepared by another physician and contained in decedent's medical records to the effect that Mr.

Harrell had withdrawn a sum of money from his account at the end of August 1983 in order to enter into a partnership. Defendant in his brief argued that the testimony amounted to inadmissible hearsay upon hearsay and was highly prejudicial to him as a link in the State's theory that defendant's motive for killing Harrell was to remove him from the partnership and to thereby obtain financial gain. However, as the State correctly points out in its brief and as defendant conceded at the outset of his argument before this Court, admission of this testimony, even if error, is not prejudicial error.

First, deceased's brother, John Harrell, had testified as the State's first witness and had referred several times, without objection by defendant, to the business relationship that had existed between defendant and the deceased. When evidence is admitted over objection and the same evidence has been previously admitted or is later admitted without objection, as here, the benefit of the objection is lost. *State v. Maccia*, 311 N.C. 222, 316 S.E. 2d 241 (1984); *State v. Corbett*, 307 N.C. 169, 297 S.E. 2d 553 (1982). In addition, defendant himself had already testified at some length about the particulars of his partnership with Mr. Harrell. At most, the challenged testimony merely corroborated defendant's own testimony that he and decedent entered into a joint business venture. We find no error in the trial court's overruling defendant's objection to this testimony.

### III.

[5] In defendant's final assignment of error, he contends that the trial court committed "plain error" by failing to instruct the jury as follows:

> If the defendant was on his own premises, in his home, or at his place of business, he could stand his ground and repel force regardless of the character of the assault being made upon him. However, the defendant would not be excused if he used excessive force.

The uncontroverted evidence at trial was to the effect that defendant resided in, and operated his business from, the building known as Geno's. According to his testimony at trial, defendant shot and killed Mr. Harrell in self-defense as Mr. Harrell came through the doorway of Geno's threatening to kill him.

Ordinarily, when a person who is free from fault in bringing on a difficulty is attacked in his own home or on his own premises, the law imposes on him no duty to retreat before he can justify his fighting in self-defense. The person is entitled to stand his ground, to repel force with force, and to increase his force to overcome the assault and to secure himself from harm. *State v. Johnson*, 261 N.C. 727, 136 S.E. 2d 84 (1964).

*State v. McCray*, 312 N.C. 519, 532, 324 S.E. 2d 606, 615 (1985). *See also State v. Grant*, 228 N.C. 522, 46 S.E. 2d 318 (1948) (defendant had no duty to retreat when assaulted by his brother-in-law, feloniously or nonfeloniously, in his own store); Annot., "Homicide: Duty to Retreat as Condition of Self-Defense When One is Attacked at His Office or Place of Business or Employment," 41 A.L.R. 3d 584 (1972).

Here, defendant submitted no request for special jury instructions to the effect that he had the right to stand his ground and repel force with force in his own home or place of business if he were found not to be the aggressor. Following the close of all the evidence, the trial judge asked, "Gentlemen, are there any written requests regarding the Court's Charge to the Jury?" Defense counsel responded, "I take it your Honor will also charge on self-defensive [sic], obviously." The trial judge noted for the record that there were no "special written requests regarding the Court's Charge to the Jury." Just prior to instructing the jury, the trial judge stated for the record:

[T]he defendants [sic], at the close of all the evidence, had requested that the Court include in its principle [sic] charge an instruction on self-defense and that the Court advised the District Attorney and the Attorneys for the defendant that the Court would include in its charge the pattern jury instruction on self-defense contained in Criminal Pattern Jury Instruction 206.10 . . . .

Just before the jury began its deliberations and after having charged, *inter alia*, on self-defense as set out in N.C.P.I.— Crim. 206.10 (1983), the trial judge inquired of counsel, "All right gentlemen, are there any requests for any changes or modifications or additions to the Court's Charge to the Jury?" to which defense counsel responded, "Not for the defendant."

The paragraph of N.C.P.I.—Crim. 206.10 (1983) at p. 8 relating to the burden of proof of self-defense and the effect of an imperfect self-defense concludes with a footnote which states, "Where the evidence raises the issue of retreat, see alternative paragraph set forth in N.C.P.I.—Crim. 308.10." *Id.* at n. 7. N.C.P.I. —Crim. 308.10 (1983) reads as follows:

> SELF-DEFENSE, RETREAT—INCLUDING HOMICIDE (TO BE USED FOLLOWING THE SELF-DEFENSE INSTRUCTIONS WHERE RETREAT IS IN ISSUE.)
>
> > *Note Well: This instruction is to be used if the evidence shows that the defendant was at his home or on his premises or at his place of business when the assault on him occurred.*
>
> If the defendant was not the aggressor and he was [in his own home] [on his own premises] [at his place of business] he could stand his ground and repel force with force regardless of the character of the assault being made upon him. However, the defendant would not be excused if he used excessive force.

(Footnotes omitted.)

The trial court's instruction on self-defense did not include the N.C.P.I.—Crim. 308.10 "alternative paragraph" (the "no duty to retreat" instruction).

This Court has held in many cases that where competent evidence of *self-defense* is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case, and the trial judge must give the instruction even absent any specific request by the defendant. *See, e.g., State v. Todd*, 264 N.C. 524, 142 S.E. 2d 154 (1965). *See also State v. Anderson*, 40 N.C. App. 318, 253 S.E. 2d 48 (1979); *State v. Robinson*, 40 N.C. App. 514, 253 S.E. 2d 311 (1979). *Cf. State v. Jones*, 299 N.C. 103, 261 S.E. 2d 1 (1980) ("defense of home" instruction); *State v. Miller*, 267 N.C. 409, 148 S.E. 2d 279 (1966) (same); *State v. Spruill*, 225 N.C. 356, 34 S.E. 2d 142 (1945) (same). It has also been held that where supported by the evidence in a claim of self-defense, an instruction negating defendant's *duty to retreat* in his home or premises must be given even in the absence of a request by defendant. *E.g., State v. Poplin*, 238 N.C.

728, 78 S.E. 2d 777 (1953); *State v. Ward*, 26 N.C. App. 159, 215 S.E. 2d 394 (1975).

The State here contends that these rules have been altered by the recent amendment of Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure, which provides in pertinent part:

> No party may assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that the opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

The State finds support for its position in *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983), in which the defendant argued that the trial court erred in failing, *ex mero motu*, to instruct the jury on simple assault in his trial for attempted armed robbery. Case law existed which required a trial judge to instruct on a lesser-included offense supported by the evidence even absent a specific request for such an instruction. *State v. Brown*, 300 N.C. 41, 265 S.E. 2d 191 (1980). Assuming, without deciding, that simple assault was a lesser-included offense of armed robbery, this Court in *Odom* stated that the *Brown* rule was "altered" by the amendment to Rule 10(b)(2). A closer analysis of the interrelationship of these rules convinces us that Rule 10(b)(2), as amended, does not, in fact, "alter" the rule of *Brown* or the analogous rule of *Todd, Spruill, Jones, Miller,* and *Poplin* (where competent evidence is presented, the trial judge must give self-defense and "no duty to retreat" instruction even absent specific request). These rules, placing upon a trial judge the duty to instruct, *ex mero motu*, on a substantial and essential feature of the case, are undisturbed by the Rule 10(b)(2) amendment. However, Rule 10(b)(2) operates to preclude a defendant from *assigning as error* on appeal a trial judge's failure to so instruct unless defendant preserves the error by making a timely objection at trial.

In *Odom*, where this Court held that Rule 10(b)(2) barred defendant from assigning error to an unobjected-to omitted jury instruction, we adopted the "plain error" rule to allow for review of some assignments of error normally barred by Rule 10(b)(2). As stated in *Odom*:

> [The "plain error" rule] is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

307 N.C. at 660, 300 S.E. 2d at 378 (emphasis in original) (*quoting United States v. McCaskill,* 676 F. 2d 995, 1002 (4th Cir.), *cert. denied,* 459 U.S. 1018, 74 L.Ed. 2d 513 (1982) ). This Court has cautioned that "even when the 'plain error' rule is applied, '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' *Henderson v. Kibbe,* 431 U.S. 145, 154, 52 L.Ed. 2d 203, 212, 97 S.Ct. 1730, 1736 (1977)." *State v. Odom,* 307 N.C. at 660-61, 300 S.E. 2d at 378.

> The plain error rule applies only in truly exceptional cases. Before deciding that an error by the trial court amounts to "plain error," the appellate court must be convinced that absent the error the jury probably would have reached a different verdict. *State v. Odom,* 307 N.C. at 661, 300 S.E. 2d at 378-79. In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. *State v. Black,* 308 N.C. at 741, 303 S.E. 2d at 806-07. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have preserved their rights by timely objection. This is so in part at least because the defendant could have prevented any error by making a timely objection. *Cf.* N.C.G.S. § 15A-1443(c) (defendant not prejudiced by error resulting from his own conduct).

*State v. Walker,* 316 N.C. 33, 39, 340 S.E. 2d 80, 83-84 (1986).

Defendant here contends that application of the "plain error" rule is appropriate in light of *Odom* to reveal such a fundamental error as to entitle him to a new trial. We disagree. Although it was error for the trial court not to instruct the jury as to defendant's right to stand his ground if it believed his testimony and found that he was not the aggressor, *e.g., State v. Poplin,* 238 N.C. 728, 78 S.E. 2d 777 (1953), this error was not properly preserved for review by reason of defendant's failure to comply with Rule 10(b)(2), and we find upon review of the record as a whole, pursuant to *Odom* and *Walker,* that such error did not constitute "plain error."

The evidence for the defendant tended to show that he acted in self-defense in shooting Mr. Harrell only after Mr. Harrell, without provocation, burst into Geno's threatening to kill him. Defendant testified that prior to the shooting, Harrell went into a rage, picked up a hatchet, and threw it through the front door at him. Harrell then entered the building, pursued defendant with a knife, and ran out the back door. Defendant attempted to lock Harrell out of the building by securing the doors, but Harrell went around to the front of the building, threw a desk/chair toward the front door at defendant, then came into the building saying to defendant, "This is it . . . I'm going to kill you." The defendant testified that he was in fear for his life at the time and that he acted in self-defense when he shot Harrell coming at him through the doorway.

The State's case was based on the theory that defendant intentionally, unlawfully, with premeditation and deliberation, and without provocation fired a shotgun from inside Geno's at decedent who, being outside the store with his left side turned toward defendant, was preparing to sit down in a chair where he had set up a table. The State's theory was strongly supported by both the physical evidence and the testimony of witnesses, including disinterested eyewitnesses.

Thus, the evidence set out two very different theories of the events that led to the death of Yates Harrell on 4 July 1984—(1) a premeditated, deliberate murder, and (2) a killing in self-defense. The jury obviously believed the State's theory and disbelieved defendant's.

Our review of the whole record fails to convince us that absent the error, the jury probably would have reached a different verdict. Therefore, the defendant has not carried his burden of showing "plain error." *State v. Walker*, 316 N.C. 33, 340 S.E. 2d 80 (1986).

No error.

Justice EXUM dissenting.

I cannot subscribe to the majority's view that the cross-examination of defendant concerning his earlier assaults with a shotgun against Mike Hall and the chief of police, while error, was not reversible error.

That defendant shot Harrell to death is conceded; but the degree of his culpability in doing so, if any, is a close question. His defense was self-defense; and, on the face of it, his version of the incident seems as plausible as, if not more plausible than, the state's version. According to the state's witnesses defendant without provocation simply shot deceased to death at defendant's business establishment in the early evening of 4 July 1984, in the presence of witnesses to whom defendant immediately went and asked to come over and see what he had done. Defendant's evidence tended to show, in the words of the majority, "that he reasonably felt it necessary to shoot Harrell in order to protect himself from Mr. Harrell, a 6'-3", 280-pound manic depressive who was coming at him through the doorway of his home and business threatening to kill him." That the deceased was suffering from a manic depressive psychiatric disorder exacerbated by alcohol consumption and that he had a substantial blood alcohol content on the occasion in question was established by disinterested witnesses. Further, the state's evidence also corroborated defendant's testimony that the deceased threw a hatchet at him which landed under a sofa in the business establishment. Investigators found the hatchet under the sofa.

Defendant's admission that Harrell had no weapon at precisely the time defendant fired his shotgun weakens defendant's case for perfect self-defense. Nevertheless, it would have been well within the realm of reason for the jury to have determined defendant to be guilty of manslaughter or second degree murder.

The jury might have convicted defendant of manslaughter on the theory that defendant shot in the heat of passion upon adequate provocation or used excessive force under the circumstances. *See State v. Wallace*, 309 N.C. 141, 305 S.E. 2d 548 (1983). The jury might have determined him guilty of second degree murder on the ground that he shot pursuant to a provocation insufficient to reduce the crime to manslaughter but sufficient to rob it of premeditation and deliberation and reduce it to second degree murder. *See State v. Thomas*, 118 N.C. 1113, 24 S.E. 431 (1896). I believe that without the challenged cross-examination the jury might well have opted, if not for acquittal, at least for a lesser degree of homicide than first degree murder; therefore, but for this cross-examination there is a "reasonable possibility that . . . a different result would have been reached at trial." N.C.G.S. § 15A-1443(a) (1983).

The principal reason Rule 608(b) prohibits cross-examination concerning specific acts of misconduct to impeach credibility (unless these acts bear on truthfulness) is the potential such cross-examination presents for undue prejudice, especially for a testifying criminal defendant. Evidence of a criminal defendant's former misconduct not bearing on truthfulness tends to draw a jury's attention from the real issues in the case, *United States v. Bledsoe*, 531 F. 2d 888, 891 (8th Cir. 1976), and may incline a jury to convict simply because defendant is "shown to be a bad man." *State v. Ervin*, 340 So. 2d 1379, 1381 (La. 1976). It is "[t]o minimize the possibility of such prejudice to defendant [that] statutes . . . exclude" such evidence. *Id.* "Restrictions on the use of character evidence . . . help prevent juries from convicting defendants for the wrong reasons." Note, 63 N.C. L. Rev. 535, 543 (1985). "In tacit recognition of the potential for unjustifiable prejudice . . . , [Rule 608(b)] limits" inquiry for impeachment of a witness, including a criminal defendant, to acts of misconduct "probative of truthfulness or untruthfulness." Crumpler and Widenhouse, "An Analysis of the New North Carolina Evidence Code: Opportunity for Reform," 20 Wake Forest L. Rev. 1, 44 (1984). I believe it reasonably possible that the cross-examination complained of here fulfilled its potential for prejudice to defendant.

Further, the state argues the evidence of defendant's past assaultive behavior with a shotgun is substantively admissible because it tends to prove defendant was the aggressor and thereby

to negate his claim of self-defense. Although the majority correctly rejects this theory of admissibility, it is at least reasonably possible that the jury improperly viewed this evidence as the state contends it should be viewed, and as a result improperly rejected defendant's claims of self-defense and reduced culpability.

I, therefore, would grant defendant a new trial because of the improper cross-examination.